[This opinion has been published in *Ohio Official Reports* at 78 Ohio St.3d 15.]

THE STATE OF OHIO, APPELLEE, *v.* TAYLOR, APPELLANT.

[Cite as *State v. Taylor*, 1997-Ohio-243.]

*Criminal law—Aggravated murder—Death penalty upheld—Evidence sufficient for jury to have found prior calculation and design, when.*

(No. 96-119—Submitted September 25, 1996—Decided March 19, 1997.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 65711.

_____

{¶ 1} On November 24, 1992, defendant-appellant, Michael N. Taylor, shot and killed Marion "Donny" Alexander in a bar. Despite appellant's self-defense claims, the jury found prior calculation and design, convicted appellant of aggravated murder, and recommended the death penalty.

{¶ 2} Between 10:00 and 11:00 p.m. on November 24, 1992, appellant, his girlfriend Sandra Paul, and David Roseborough arrived at the Club Seville, a bar in Garfield Heights. Shortly thereafter, Marion "Donny" Alexander came in. Alexander, a regular in the bar, greeted Darlene Youngblood and Debra Lymore, who both worked at the bar, as well as Denise Shephard, another regular. They all sat around the main bar, but Alexander later took a seat alone at the nearby piano bar. Alexander did not talk with Paul, whom he had formerly dated, nor to appellant, whom he had previously met.

{¶ 3} According to Shephard, Alexander acted quietly, and did not complain to or argue with appellant that night. However, appellant, Paul, and Roseborough described Alexander as loud and boisterous. Appellant and Paul claimed Alexander stared at them when they were dancing that night soon after they arrived at the club. According to Roseborough, Alexander flashed a large roll of bills and said, "If a nig*** ain't getting it like this, he ain't suppose[d] to be in

here." Paul recalled Alexander saying, "Any nig*** [who] did not have any money, wasn't shit." Appellant believed Alexander was trying to humiliate him.

{¶ 4} Later, some twenty to thirty minutes after appellant, Paul, and Roseborough had arrived, Paul went to the jukebox to play music. Alexander asked her to play a song for him. Appellant, still seated at the main bar, objected to Alexander's request. Youngblood testified that appellant told Alexander, "Put your own goddamn dollar in the box. My woman is not playing you no music." Roseborough recalled appellant said, "Man, I give her the money so she could play the music that we want to hear. *** If you want to hear some music, put your money in there like I did ***."

{¶ 5} According to Youngblood, Alexander replied, "It ain't no problem. I have got a dollar here. *** I just asked her to play ***." According to Lymore, Alexander replied, "What's the problem? I have been knowing her. I talk to her when you are not around." Appellant again told Alexander, "Put your own goddamn dollar in there." Alexander and appellant glared at each other for a "couple of seconds," but did not approach each other. Then Paul walked back to where appellant was sitting.

{¶ 6} According to appellant's friends, Alexander told appellant after the jukebox incident that "this is his bar, and he do[es] what *** he wants to do, [and] says what *** he wants," and if appellant had "a problem with anything, I'm saying you can see me today, tomorrow." Alexander also allegedly cursed appellant as a "punk, hip mother fucker." It was asserted by the defense that when Paul was leaving the bar, Alexander said, "Bitch *** [I told] you not to bring this mother fucker up here to my bar."

{¶ 7} When Paul got back to her seat, appellant told her, "Get your goddamn coat. We're getting out of here." Paul asked, "Can I drink my drink first *** [and] hear my music." Appellant told her he did not "have time for this 'Kid's shit,' Let's go." Within a minute, Paul had put her coat on and left the bar. Roseborough and

2

appellant started to follow her, but Roseborough changed direction and walked over behind Alexander to the jukebox. Appellant stopped a little past Alexander. Roseborough said to appellant, "Look out," and Alexander stood up and raised his hands. Alexander told appellant, "Don't start no shit and it won't be no shit."

{¶ 8} Appellant replied, "What did you say, mother fucker," pulled out a semiautomatic 9 mm pistol, and shot Alexander several times. After being shot three times, Alexander fell face down and tried to crawl away. Then appellant walked closer to Alexander and fired three or four more shots into his back.

{¶ 9} Appellant testified that Alexander had blocked his way and pulled a gun on him as appellant walked out of the bar. Appellant claimed he "thought [Alexander] was going to shoot *** [or] kill me." Roseborough testified that Alexander was reaching into his coat when appellant shot him.

{¶ 10} However, of those present, only appellant claimed that he saw Alexander with a gun. Paul testified that Alexander always carried a gun, but she did not claim that she saw one that night. Testimony from police officers suggested that they did not find any gun on the premises.

{¶ 11} Appellant and Roseborough left after appellant shot Alexander. As appellant left, he leaned out of Paul's car window and yelled to Youngblood, "It was self-defense." Youngblood called 911, and police and paramedics quickly arrived.

{¶ 12} At 11:26 p.m., patrolman Michael Naso received a radio call, and he arrived at the bar within two minutes. Naso found Alexander on the floor bleeding, and Shephard was "straddling his back [in] near hysteria." Naso found seven 9 mm shell cartridges in the club and a spent bullet inside the men's room.

{¶ 13} Although appellant and his friends claimed that Alexander had a wad of money, "two grand or close," police found only thirteen dollars on him. Shephard testified she had given Alexander fifty dollars earlier that day, and that he usually did not have a lot of money on him.

**{¶ 14}** Deputy Coroner Dr. Robert Challener found that Alexander had been shot seven times, the bullets perforating the body, including once in each thigh, twice in the abdomen, and twice in the back. Alexander died as a result of these wounds. At least three bullets entered from the back, and the path of one or more bullets was consistent with the victim's lying on the ground with the assailant standing.

**{¶ 15}** Rejecting appellant's self-defense claim, the jury convicted him of aggravated murder with a death penalty specification for a prior murder conviction. R.C. 2929.04(A)(5). The jury also found appellant guilty of a firearms specification and a prior aggravated-felony specification. After considering mitigation evidence, the jury recommended the death penalty, and the trial court sentenced appellant to death. The court of appeals affirmed.

**{¶ 16}** The cause is now before this court upon an appeal as of right.

*Stephanie Tubbs Jones*, Cuyahoga County Prosecuting Attorney, *George J. Sadd* and *Winston Grays*, Assistant Prosecuting Attorneys, for appellee.

*David L. Doughten* and *John P. Parker*, for appellant.

_____

**ALICE ROBIE RESNICK, J.**

**{¶ 17}** In his appeal to this court, appellant raises eighteen propositions of law for our review. We have thoroughly reviewed each, and find that none warrants a reversal of appellant's conviction or of his death sentence. In addition, we have conducted an independent review of the record, have weighed the aggravating circumstance against the mitigating factors, and have examined the proportionality of the death sentence to the penalty imposed in similar cases. For the reasons which follow, we affirm appellant's conviction and sentence of death.

**I**

**Sufficiency of Evidence**

{¶ 18} In proposition of law I, appellant argues that "prior calculation" and "design" are separate elements of "aggravated murder" as defined in R.C. 2903.01(A). Appellant claims the evidence is insufficient to prove those separate elements; hence, he contends he is not guilty of aggravated murder.

{¶ 19} However, appellant cites no case holding that "prior calculation and design" are two separate elements, and we reject such a view. Rather, the phrase "prior calculation and design" is a single indivisible term, describing the *mens rea* element of proof necessary to find a violation of R.C. 2903.01(A). Having rejected that claim, we now consider whether the trial evidence was sufficient to prove that appellant murdered Alexander "with prior calculation and design."

{¶ 20} In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus (in part), following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

**A. The Meaning of "Prior Calculation and Design"**

{¶ 21} Under former R.C. 2901.01, "murder in the first degree," aside from murder by poison or felony-murder, required proof of "deliberate and premeditated malice." See *State v. Stewart* (1964), 176 Ohio St. 156, 27 O.O.2d 42, 198 N.E.2d 439. Effective January 1, 1974, the General Assembly reclassified first-degree murder as "aggravated murder" and substituted a requirement of "prior calculation and design" to replace the more traditional "deliberate and premeditated malice." (134 Ohio Laws, Part II, 1866, 1900, Am.Sub.H.B. No. 511.) See *State v. Jenkins* (1976), 48 Ohio App.2d 99, 2 O.O.3d 73, 355 N.E.2d 825. R.C. 2903.01(A),

amended in 1981, retained the term "prior calculation and design" as a necessary element of aggravated murder.  (139 Ohio Laws, Part I, 1, 3.)

{¶ 22} According to the 1973 Technical Committee Comment to Am.Sub.H.B. No. 511, a Legislative Service Commission summary, R.C. 2903.01 "restates the former crime of premeditated murder so as to embody the classic concept of the planned, cold-blooded killing while discarding the notion that only an instant's prior deliberation is necessary.  By judicial interpretation of the former Ohio law, murder could be premeditated even though the fatal plan was conceived and executed on the spur of the moment."  See, *e.g.*, *State v. Stewart; State v. Schaffer* (1960), 113 Ohio App. 125, 17 O.O.2d 114, 177 N.E.2d 534.

{¶ 23} According to the committee comment, "the phrase 'prior calculation and design' [was employed] to indicate studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim.  Neither the degree of care nor the length of time *** are critical factors in themselves, but they must amount to more than momentary deliberation."

{¶ 24} In *State v. Cotton* (1978), 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190, at paragraph one of the syllabus, we agreed that "'prior calculation and design' is a more stringent element than the 'deliberate and premeditated malice' which was required under prior law."  The General Assembly's apparent intention "was to require more than the few moments of deliberation permitted in common law interpretations of the former murder statute, and to require a scheme designed to implement the calculated decision to kill."  *Id.,* 56 Ohio St.2d at 11, 10 O.O.3d at 6, 381 N.E.2d at 193.  Also, in *Cotton*, at paragraph two of the syllabus, we held that "[i]nstantaneous deliberation is not sufficient to constitute 'prior calculation and design.'"  However, under the particular facts of *Cotton,* we found prior calculation and design when, after a botched forgery attempt, the accused wrestled a gun from a police officer, fired shots at pursuing police, and then returned to the scene to kill an officer he had wounded as the officer was attempting to crawl away.

{¶ 25} In *State v. Jenkins*, 48 Ohio App.2d at 102, 2 O.O.3d at 75, 355 N.E.2d at 828, the court of appeals found three factors important in determining whether prior calculation and design exists: (1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or "an almost instantaneous eruption of events"? The court in *Jenkins* found no prior calculation in the following "almost spontaneous" eruption of events: A motorist told the accused, standing in the road, to get out of his way, and the accused went to his own car, retrieved a shotgun, and killed the motorist.

{¶ 26} This court has upheld findings of prior calculation and design in some short-lived emotional situations other than the Technical Committee's "classic" concept of the "planned, cold-blooded killing." Committee Comment to Am.Sub.H.B. No. 511, R.C. 2903.01. See, *e.g.*, *State v. Claytor* (1991), 61 Ohio St.3d 234, 574 N.E.2d 472 (encounter with unarmed Veterans Administration guards and pursuit of wounded guard); *State v. Robbins* (1979), 58 Ohio St.2d 74, 12 O.O.3d 84, 388 N.E.2d 755 (after argument and assault, defendant retrieved weapon and stabbed neighbor); *State v. Toth* (1977), 52 Ohio St.2d 206, 6 O.O.3d 461, 371 N.E.2d 831 (accused and victim encountered each other in several bars in one evening).

{¶ 27} At other times, Ohio courts (including this court) have declined to uphold findings of "prior calculation and design" in explosive, short-duration situations. See, *e.g.*, *State v. Reed* (1981), 65 Ohio St.2d 117, 19 O.O.3d 311, 418 N.E.2d 1359 (after a botched theft, accused shot pursuing civilian and police officer); *State v. Mulkey* (1994), 98 Ohio App.3d 773, 649 N.E.2d 897 (street-gang attack on victim); *State v. Davis* (1982), 8 Ohio App.3d 205, 8 OBR 276, 456 N.E.2d 1256 (excluded patron shot bar owner and doorman).

{¶ 28} Our review of the preceding cited cases convinces us that it is not possible to formulate a bright-line test that emphatically distinguishes between the

presence or absence of "prior calculation and design." Instead, each case turns on the particular facts and evidence presented at trial.

## B. Evidence of Prior Calculation and Design

{¶ 29} At trial, appellant argued the insufficiency of evidence of prior calculation and design and moved to dismiss under Crim.R. 29 after the state rested, and again at the close of all the evidence. In proposition of law I, appellant reasserts his claim that the evidence is insufficient to permit a finding of prior calculation and design.

{¶ 30} In analyzing the jury's determination that appellant acted with prior calculation and design, *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph two of the syllabus, establishes that we must review the evidence "in a light most favorable to the prosecution."

{¶ 31} In light of that standard, we find that the evidence presented at appellant's trial sufficiently supports the jury's determination of prior calculation and design. The evidence was conflicting as to the events which took place in the bar prior to the shooting. The observations made by the court of appeals as it reviewed the evidence are a reasonable interpretation of the way the jury may have viewed that evidence. The court of appeals dealt with this issue as follows:

"The evidence reveals Taylor and Alexander did have an exchange of words and intimidating glances prior to the shooting, but the shooting did not occur immediately thereafter. Both men went back to their seats. Taylor ordered his girlfriend to go outside to the car. Meanwhile, his companion, Roseborough, headed for the door but positioned himself near the door behind where Alexander was seated. When Taylor stood up from his chair to leave, Alexander stood up, put his hands up in the air, and the two men exchanged words again. Taylor immediately pulled out his gun and shot Alexander several times. Alexander fell to the ground and attempted to crawl away, but Taylor walked over to where Alexander had fallen and shot Alexander in the back several times.

"It is reasonable to infer that Taylor ordered his girlfriend to leave and waited for Roseborough to strategically position himself behind Alexander because he planned to shoot Alexander. Moreover, Taylor clearly had a choice not to shoot Alexander after Alexander fell down; Alexander was still alive but injured. Taylor made a conscious decision to walk over to where Alexander was crawling face down on the floor and shot him four more times.

"Construing this evidence in the light most favorable to the prosecution, there was sufficient evidence to prove the element of prior calculation and design. Taylor's conscious decisions to get his girlfriend out of the way, to strategically position Roseborough, and to continue to shoot Alexander after he was down, more than any other evidence proved he acted with prior calculation and design."

{¶ 32} To underscore the observations of the court of appeals, the evidence showed that Sandra Paul had introduced appellant to the victim, Alexander, in the same bar prior to the night of the murder. When Alexander met appellant at that time, Alexander warned Paul not to "be bringing him [appellant] in my bar." Although Paul claimed she told appellant about the warning sometime later, the jury could have inferred from the circumstances that appellant may have learned earlier of Alexander's statement. According to appellant, Alexander had a "nasty attitude" and elbowed him when they previously met. Clearly, Alexander and appellant had met before, and their relationship was not a cordial one.

{¶ 33} On the night of the shooting, their relationship became more strained even before the jukebox incident. Testimony was conflicting as to Alexander's behavior on the night in question. There was some testimony that Alexander acted like a gentleman that night, but some defense witnesses testified to Alexander's boisterousness. Appellant testified he thought Alexander tried to humiliate him by flashing a big roll of money and saying, "If a nig*** ain't got no money, he ain't shit." It was also contended by the defense that Alexander "stared" at Paul and appellant when they were dancing earlier that night. Roseborough claimed that

9

Alexander called appellant a "bitch" and a "punk, hip mother fucker," and invited him several times to fight after the jukebox incident. Alexander also purportedly told appellant, "Mother fucker, these are my friends up here *** [in this bar]. I say and do what I want to do in here." As Paul left the bar, Alexander reportedly told her, "Bitch, I told you not to bring this mother fucker up here to my bar."

{¶ 34} The strained relationship between appellant and Alexander occurred because Alexander had previously dated Paul. Furthermore, Alexander had warned Paul not to bring appellant into "his" bar. The night of the shooting, Alexander reportedly was rude and obnoxious, deliberately flashed money in a possible attempt to humiliate appellant, and stared at appellant and Paul as they danced.

{¶ 35} Two other specific factors, in addition to the previous relationship of the appellant and the victim, allowed the jury to find that appellant engaged in more than "instantaneous deliberation." Appellant took a gun into a bar where he knew Alexander frequently drank. The jury could reasonably have inferred that appellant may have carried the gun with an intention to use it. The jury could have drawn that inference from all the circumstances surrounding the shooting even though the prosecution did not specifically claim that appellant went to the bar with the intention of killing Alexander.

{¶ 36} Moreover, several of appellant's shots were fired after Alexander, already wounded, was lying on the floor. As Alexander tried to crawl away, appellant walked closer and fired three or four shots into his back. These circumstances also support the jury's finding of prior calculation and design, since they are inconsistent with an "instantaneous eruption of events." *State v. Jenkins*, 48 Ohio App.2d at 102, 2 O.O.3d at 75, 355 N.E.2d at 828.

{¶ 37} Even though most of the evidence indicates that the time between the jukebox incident and the shooting was only two or three minutes, there was more than sufficient evidence for the jury to reasonably have found that appellant, with prior calculation and design, decided to shoot Alexander in that space of time.

"Neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves," but "momentary deliberation" is insufficient. Committee Comment to Am.Sub.H.B. No. 511, R.C. 2903.01. In light of the strained relationship between appellant and the victim, and the other factors mentioned above, two or three minutes is more than instantaneous or momentary under these circumstances, and is more than sufficient for prior calculation and design.

{¶ 38} The situation in this case resembles previous cases in which this court upheld jury findings of prior calculation and design. See, *e.g., State v. Claytor; State v. Robbins*; *State v. Toth*. In particular, *Toth* involved a defendant who apparently was unacquainted with the victim until the evening of the killing, and a murder which occurred after brief encounters in several bars. The facts in *Toth* are similar to those in this case, and *Toth* did not involve any more evidence of studied deliberation than was present here. This court upheld the jury finding of prior calculation and design and remarked that "[t]he appellant's method of shooting *** as well as his apparent determination to follow through on a specific course of action, sufficiently supports the finding that the appellant had adopted a plan to kill." *Toth,* 52 Ohio St.2d at 213, 6 O.O.3d at 465, 371 N.E.2d at 836.

{¶ 39} When all the evidence is viewed in a light most favorable to the prosecution, as required in *Jenks*, the jury could reasonably have found the required element of prior calculation and design. Accordingly, we reject proposition of law I.

## II

### Procedural Deficiencies

{¶ 40} In proposition of law II, appellant argues that the prosecution tried the case on different facts as to the capital specification (a prior murder conviction) than were presented to the grand jury (a prior attempted murder conviction). Appellant assumes the prosecutor presented an inaccurate April 1974 journal entry

to the grand jury showing that appellant had been convicted of only attempted murder.  On April 23, 1993, well after this trial started, the prosecutor secured a *nunc pro tunc* entry correcting the April 1974 journal entry to reflect that appellant had pled guilty and was at that time convicted of two murders.

{¶ 41} Appellant did not raise this argument at trial or before the court of appeals, and hence waived this issue.  *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364.  However, even if he had raised it, appellant's claim lacks merit.  The prosecution tried the case on the same basis as that presented to the grand jury, since a death-penalty specification under R.C. 2929.04(A)(5) covers prior convictions for either murder or attempted murder.  In addition, appellant's indictment charged in specification two that he "was convicted *** of Murder, R.C. 2903.02[,] on April 8, 1974, of which an essential element was the purposeful killing or purposeful attempt to kill another."

{¶ 42} Appellant implicitly challenges the trial court's authority to make such a *nunc pro tunc* entry.  However, the trial court clearly had authority to correct factual errors in the 1974 journal entry to reflect that appellant had been convicted of two counts of murder, and not of attempted murder.  See Crim.R. 36; *State ex rel. Hill v. Niehaus* (1994), 68 Ohio St.3d 507, 628 N.E.2d 1376; *Benedict v. State* (1887), 44 Ohio St. 679, 11 N.E. 125.  Appellant's 1974 conviction was affirmed in *State v. Taylor* (July 10, 1975), Cuyahoga App. No. 33701, unreported.  An examination of that court of appeals opinion reflects that appellant's 1974 conviction was for two murders.  Appellant also admitted on cross-examination at this trial that he had been convicted of two murders in 1974.  Appellant has failed to establish any error or prejudice.  We reject proposition of law II.

{¶ 43} In proposition of law III, appellant argues that the trial court erred by issuing the April 23, 1993 *nunc pro tunc* entry as to the 1974 conviction without giving appellant or his counsel notice of the proposed change or an opportunity to be heard.  The judge who signed the *nunc pro tunc* entry, Judge Norman A. Fuerst,

12

was not the judge who presided over appellant's 1993 murder trial. At trial in the instant case, the prosecutor did not explain why he secured that April 23, 1993 *nunc pro tunc* entry after trial testimony had begun on April 22, 1993. The prosecutor also did not explain why no notice was given to opposing counsel regarding the intent to secure the entry. When the prosecutor offered the entry into evidence, appellant's counsel objected.

**{¶ 44}** The state argues that appellant was not wrongfully excluded from a crucial hearing because no hearing was held prior to Judge Fuerst's decision to issue the *nunc pro tunc* entry. However, since the 1993 trial had already started, the prosecutor arguably should have given prior notice to opposing counsel before securing the 1993 entry correcting the 1974 judgment entry.

**{¶ 45}** Nevertheless, the prosecutor did not *per se* violate appellant's right to be present at proceedings to correct the 1974 journal entry. An accused has a fundamental right to be present at all stages of his criminal trial. Section 10, Article I, Ohio Constitution; Crim.R. 43(A); *State v. Williams* (1983), 6 Ohio St.3d 281, 286, 6 OBR 345, 349, 425 N.E.2d 1323, 1330. However, Judge Fuerst's decision to sign that entry relating to the 1974 conviction was not a critical stage of appellant's 1993 trial, provided appellant had an opportunity to contest the accuracy of the corrected entry during the course of the 1993 trial. The relevant crucial stage of appellant's 1993 trial occurred when the prosecution offered the *nunc pro tunc* entry into evidence at the 1993 trial. Appellant was present at that point in his trial, appellant and his counsel had notice and an opportunity to challenge the corrected entry's admission into evidence, and they did so, albeit unsuccessfully. See *In re Petition for Inquiry into Certain Practices* (1948), 150 Ohio St. 393, 38 O.O. 258, 83 N.E.2d 58, paragraph one of the syllabus. Nor can appellant contest the accuracy of the *nunc pro tunc* entry; he admitted his 1974 conviction was for two counts of murder. In these circumstances, any irregularities concerning the *nunc pro tunc*

entry did not affect appellant's fundamental rights. See *State v. Clark* (1988), 38 Ohio St.3d 252, 258, 527 N.E.2d 844, 851.

{¶ 46} In 1982, Governor Rhodes commuted appellant's 1974 prison sentence. Despite appellant's attempt to base arguments on the commutation, the existence of appellant's 1974 murder conviction was not affected by the commutation; only the length of appellant's sentence was affected. See R.C. 2967.01(C). Even though the commutation mistakenly referred to appellant's 1974 conviction as one for "attempted murder," appellant's argument that that mistake could change the substance of his 1974 conviction is baseless. We reject appellant's proposition of law III.

{¶ 47} In proposition of law IV, appellant argues that he was prejudiced because the indictment included an irrelevant prior aggravated-felony specification. Appellant further contends that the trial judge incorrectly described to the jury the prior murder conviction as an aggravated felony.

{¶ 48} We agree that the prior aggravated-felony specification was irrelevant. Such a specification operates to increase the minimum and maximum sentence for an *aggravated felony*. See R.C. 2929.11(B)(1)(b), (B)(2)(b), (B)(3)(b), and (F). As appellant points out, *neither* murder nor aggravated murder is classified as an aggravated felony. See R.C. 2901.02(A).

{¶ 49} However, appellant was not prejudiced by the inclusion of this irrelevant prior-aggravated-felony specification or by the trial judge's misdescription of murder as an aggravated felony. The inclusion of the irrelevant specification did not cause the jury to become aware of appellant's prior murder conviction. The jury knew about that conviction because the prosecution properly introduced evidence of that prior murder conviction to prove the death-penalty specification. R.C. 2929.04(A)(5). Moreover, appellant deliberately chose to have that death-penalty specification tried to the jury. The record shows that he did so because he planned to testify and knew his conviction would inevitably be disclosed

to attack his credibility as a witness. Thus, we reject appellant's proposition of law IV.

{¶ 50} In proposition of law IX, appellant argues his rights were violated because he was absent from a brief meeting in chambers when the trial court recorded the preliminary excusal of various jurors for reasons such as medical problems and financial hardships. However, appellant was absent with his counsel's approval, and both counsel were present and agreed with the excusals.

{¶ 51} Crim.R. 43(A) preserves an accused's right to be present "at every stage of the trial." An accused's absence, however, does not necessarily result in prejudicial or constitutional error. *Snyder v. Massachusetts* (1934), 291 U.S. 97, 107-108, 54 S.Ct. 330, 333, 78 L.Ed. 674, 679, held that "the presence of the defendant [in a prosecution for felony] is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, *and to that extent only*." (Emphasis added.)

{¶ 52} Appellant relies upon *Rogers v. United States* (1975), 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1, and *United States v. Brown* (C.A.9, 1987), 832 F.2d 128. Yet, those cases involved federal, not state, trials, and counsel did not know in either of those cases about the court's unilateral jury contacts taken in the accused(s)' absence. *United States v. Gagnon* (1985), 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486, reaffirmed the *Snyder* principle that an accused's absence from a hearing at which counsel were present does not necessarily offend due process. *State v. Williams*, 6 Ohio St.3d at 285-287, 6 OBR at 348-350, 452 N.E.2d at 1329-1331, recognized that an accused's absence can be harmless error.

{¶ 53} In this case, appellant's absence did not thwart a fair and just hearing. *Snyder*. The proceeding was not a "hearing" at which the judge received evidence. It was no more than the routine noting of excuses from jury duty. The accused's absence, with counsel's consent, was harmless error. See *State v. Williams*, 6 Ohio

St.3d at 287, 6 OBR at 350, 452 N.E. 2d at 1331; *State v. Roe* (1989), 41 Ohio St.3d 18, 27, 535 N.E.2d 1351, 1362.

{¶ 54} Later, in responding to a jury question, the court incorrectly told the jury during deliberations on guilt that murder is an aggravated felony. The judge's brief written answer to the jury question was also harmless. From the record, we do not know if the court consulted counsel before answering the question or, if so, whether counsel objected to the answer or appellant's absence. Although the answer was incorrect, *i.e.*, that murder was an aggravated felony, the question and answer were innocuous. See, also, *State v. Allen* (1995), 73 Ohio St.3d 626, 630, 653 N.E.2d 675, 682; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 236-237, 15 OBR 311, 373-374, 473 N.E.2d 264, 324, and paragraph thirteen of the syllabus; *State v. Abrams* (1974), 39 Ohio St.2d 53, 68 O.O.2d 30, 313 N.E.2d 823. We reject proposition of law IX.

### III

### Evidence Issues

{¶ 55} In proposition of law VI, appellant argues the trial court erred by admitting gruesome photographs that prejudiced both the guilt-determination and penalty phases. However, appellant did not object to these photographs at trial and waived all but plain error. *State v. Williams,* 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364. We find no plain error and reject proposition of law VI. Cf. *State v. Lundgren* (1995), 73 Ohio St.3d 474, 653 N.E.2d 304; *State v. Morales* (1987), 32 Ohio St.3d 252, 257, 513 N.E.2d 267, 273.

{¶ 56} In proposition of law VII, appellant argues that the state improperly cross-examined him about details of his prior murder conviction. However, the trial court "has broad discretion in determining the extent to which testimony will be admitted under Evid.R. 609." *State v. Wright* (1990), 48 Ohio St.3d 5, 548 N.E.2d 923, syllabus; see Evid.R. 609(A). Accord *State v. Amburgey* (1987), 33 Ohio St.3d 115, 515 N.E.2d 925.

{¶ 57} In this case, appellant failed to disclose on direct examination that his 1974 murder conviction was for two murders; thus, the prosecutor's brief inquiry on cross was proper. See *State v. DePew* (1988), 38 Ohio St.3d 275, 528 N.E.2d 542, paragraph three of the syllabus. Additionally, the prosecutor needed to use the prior murder conviction to prove the death-penalty specification.

{¶ 58} Appellant's claim that the Governor's 1982 commutation of his previous sentence erased the murder conviction lacks any merit. A commutation is not a pardon. *State ex rel. Maurer v. Sheward* (1994), 71 Ohio St.3d 513, 520, 644 N.E.2d 369, 375; *In re Victor* (1877), 31 Ohio St. 206, 207. See Evid.R. 609(C); R.C. 2967.01(B) and (C). We reject proposition of law VII.

{¶ 59} In proposition of law X, appellant argues that Denise Shephard disclosed improper victim-impact evidence when she briefly mentioned in the guilt phase that she had attended counseling for two months to deal with the shooting's psychological impact on her. If error, that brief testimony was harmless. Cf. *State v. Allard* (1996), 75 Ohio St.3d 482, 499-500, 663 N.E.2d 1277, 1292; *State v. Lorraine* (1993), 66 Ohio St.3d 414, 420-421, 613 N.E.2d 212, 218-219. Any impact on the sentence did not violate appellant's fundamental rights. *Payne v. Tennessee* (1991), 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720.

## IV

## Guilt Instruction Issues

{¶ 60} In propositions of law V, VIII, and XIII, appellant alleges deficiencies in the court's jury instructions. However, appellant failed to request specific instructions or object at trial on issues he now raises, except as to proposition of law VIII, and thus waived all but plain error. Crim.R. 30(A); *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. We find that no alleged deficiency would cause a different trial result or create a manifest miscarriage of justice. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d

178, 372 N.E.2d 804, paragraphs two and three of the syllabus. We therefore reject propositions of law V and XIII.

{¶ 61} In proposition of law VIII, appellant argues the trial court erred in instructing the jury, over objection, that "flight, in and of itself, does not raise a presumption of guilt, but unless satisfactorily explained, it tends to show consciousness of guilt or a guilty connection with the crime."

{¶ 62} Despite appellant's claims, this instruction on flight was neither arbitrary nor unreasonable, and did not create an improper mandatory presumption. "Flight from justice *** may be indicative of a consciousness of guilt." *State v. Eaton* (1969), 19 Ohio St.2d 145, 48 O.O.2d 188, 249 N.E.2d 897, paragraph six of the syllabus. Accord *State v. Wilson* (1988), 47 Ohio App.3d 136, 140-141, 547 N.E.2d 1185, 1188-1189; cf. *State v. Strub* (1975), 48 Ohio App.2d 57, 63, 2 O.O.3d 40, 43, 355 N.E.2d 819, 824. Nor did the instruction improperly comment on appellant's silence, since he testified. See *State v. Fields* (1973), 35 Ohio App.2d 140, 64 O.O.2d 248, 300 N.E.2d 207. We reject proposition of law VIII.

**V**

**Sentencing Issues**

{¶ 63} In proposition of law XI, appellant urges that the prosecutor made improper and prejudicial comments in his closing arguments to the jury at the sentencing phase. Appellant claims the prosecutor's remark that the victim did not have an opportunity to plead for his life before he was killed was an improper appeal to the jury's emotions. The trial court sustained appellant's objection to this and related remarks, and appellant did not ask for a curative instruction. Appellant also complains because the prosecutor asked the jury, over objection, to show sympathy towards the victim.

{¶ 64} None of these remarks constituted prejudicial error. "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 318, 470 N.E.2d 883, 885. Evidence or comments about crime victims, including the impact of a crime on victims, do not offend the United States or Ohio Constitutions, and did not harm appellant. See *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720; *State v. Hill* (1996), 75 Ohio St.3d 195, 199, 661 N.E.2d 1068, 1075. "The victims cannot be separated from the crime." *State v. Lorraine*, 66 Ohio St.3d at 420, 613 N.E.2d at 218-219. Accord *State v. Slagle* (1992), 65 Ohio St.3d 597, 611-612, 605 N.E.2d 916, 929-930.

{¶ 65} Appellant also asserts in proposition of law XI that the prosecutor improperly commented on nonstatutory aggravating factors by referring to appellant's prior conviction for two murders. Appellant's claim lacks merit. The charged death-penalty specification alleged appellant had previously been convicted of murder. See R.C. 2929.04(A)(5); *State v. Evans* (1992), 63 Ohio St.3d 231, 238, 586 N.E.2d 1042, 1050; *State v. Gumm* (1995), 73 Ohio St.3d 413, 653 N.E.2d 253, syllabus.

{¶ 66} In propositions of law XII, XIV and XVII, appellant argues instructional errors during the sentencing phase. However, appellant waived these issues when he did not raise them in the court of appeals. See *State v. Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, at paragraph two of the syllabus.

{¶ 67} Moreover, except as noted below, appellant at trial did not propose instructions on issues he now raises or object to the instructions given. Appellant's failure to propose instructions and to object to those given waives any error "unless, but for the error, the outcome of the trial clearly would have been otherwise." *State v. Underwood*, 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, at the syllabus. See *State v. Long*, 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, at paragraph two of the syllabus. See, also, *State v. Wolons* (1989), 44 Ohio St.3d 64, 541 N.E.2d 443, paragraph one of the syllabus.

{¶ 68} In proposition of law XII, appellant argues the trial court gave the equivalent of an improper "acquittal first" jury instruction during the penalty phase. Appellant argues the trial court should have specifically instructed "that if the jury was unable to agree on whether the aggravating factors outweighed the mitigation evidence, it could consider a lesser sentence." See *State v. Brooks* (1996), 75 Ohio St.3d 148, 159-160, 661 N.E.2d 1030, 1040-1041; cf. *State v. Thomas* (1988), 40 Ohio St.3d 213, 219-220, 533 N.E.2d 286, 292-293.

{¶ 69} The trial court instructed the jury: "If all 12 members of the jury find *** that the aggravating circumstance *** outweighs the mitigating factors, then *** you *** must *** recommend *** the sentence of death ***. [But] if *** you find that the State of Ohio failed to prove *** that the aggravating circumstance *** outweighs the mitigating factors, then you will return your verdict reflecting your decision. In this event, you will then proceed to determine which of the two possible life imprisonment sentences to recommend to the Court."

{¶ 70} Our review of the trial court's instructions reveals that the trial court simply told the jury it *must* decide between the life sentence options *if* it found the

state had failed to prove that the aggravating circumstance outweighed the mitigating factors. The trial court did not give an improper "acquittal first" instruction and did not tell the jury how to proceed if jurors did not all agree on a life or death sentence. The jury was free to consider a life sentence even if jurors had not unanimously rejected the death penalty.

{¶ 71} Appellant did not preserve this issue. He failed to ask the trial judge to instruct the jury that "[y]ou are not required to determine unanimously that the death sentence is inappropriate before you consider the life sentences." *Brooks*, 75 Ohio St.3d at 160, 661 N.E.2d at 1041. Although the instruction appellant now seeks may be a desirable one, its absence was not plain error. See *State v. Davis* (1996), 76 Ohio St.3d 107, 116-118, 666 N.E.2d 1099, 1108-1109; *State v. Williams* (1995), 73 Ohio St.3d 153, 168, 652 N.E.2d 721, 733-734; *State v. Jenkins*, 15 Ohio St.3d at 213, 15 OBR at 353, 473 N.E.2d at 307. We reject proposition of law XII.

{¶ 72} In proposition of law XIV, appellant takes issue with trial court instructions to the jury during the penalty phase. Appellant claims the trial court erred in instructing the jury, "Reasonable doubt is present when, you, the jurors, *** cannot say that you are firmly convinced of the truth of the charge." Appellant had requested that the jury be instructed that "[r]easonable doubt is present when you are not firmly convinced that death is the appropriate punishment." See *State v. Wolons*, 44 Ohio St.3d 64, 541 N.E.2d 443, paragraph one of the syllabus.

{¶ 73} Although appellant's proposed instruction may be preferred, the flaw, if any, is harmless. An instruction identical to that given by the trial court in this case was upheld in *State v. Woodard* (1993), 68 Ohio St.3d 70, 76-77, 623 N.E.2d 75, 80, and in *State v. Spirko* (1991), 59 Ohio St.3d 1, 17, 570 N.E.2d 229, 248. Also, a "single instruction *** must be viewed in the context of the overall charge." *State v. Price* (1970), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772, paragraph four of the syllabus. Overall, the trial court clearly instructed the jury

that, before recommending death, it must be convinced beyond a reasonable doubt that the aggravating circumstance outweighed the mitigating factors, and that the prosecution had the burden of proof on the issue.

{¶ 74} Appellant also complains because the trial court referred to the charged R.C. 2929.04(A)(5) aggravating circumstance as "repeat murder." However, the trial court's use of that short, convenient term to refer to the aggravating circumstance was not improper nor did it inject a nonstatutory aggravating circumstance into the trial. The indictment as well as the trial court used the term "repeat murder" to refer to the specification, and appellant did not object. It is not unusual to use the term "repeat murder" in this context. See, *e.g.,* Committee Comment to Am.Sub.H.B. No. 511, R.C. 2929.04; *State v. Benner* (1988), 40 Ohio St.3d 301, 304, 533 N.E.2d 701, 707; *State v. Bayless* (1976), 48 Ohio St.2d 73, 80, 2 O.O.3d 249, 253, 357 N.E.2d 1035, 1043.

{¶ 75} Appellant also argues that the trial court erred in defining a "mitigating factor" as one "extenuating or reducing the degree of the defendant's blame or punishment." Appellant requested a more comprehensive definition of "mitigating factors." See *State v. Holloway* (1988), 38 Ohio St.3d 239, 242, 527 N.E.2d 831, 835. Any instructional error on this point was harmless. *State v. Phillips* (1995), 74 Ohio St.3d 72, 101-102, 656 N.E.2d 643, 669; *State v. Woodard*, 68 Ohio St.3d at 77, 623 N.E.2d at 80.

{¶ 76} Appellant further contends under proposition of law XIV that the trial court erred by instructing the jury not to be "influenced by *any* consideration of sympathy," as opposed to the term "*mere* sympathy."[1] Yet, appellant asked that sympathy be excluded in considering the sentence, and, in any event, sympathy is

---

1. The trial court's instruction to the jury regarding sympathy appears in the record as, "You must be influenced by any consideration of sympathy ***." The word "not" is missing from this sentence in the record. If the trial court did indeed omit the word "not," any prejudice would have been in appellant's favor. Hence, any possible error in the trial court's instruction on this narrow point did not prejudice appellant.

not a relevant sentencing criterion. There is no practical difference between "mere sympathy" and "any sympathy" in this context. See *California v. Brown* (1987), 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934; *State v. Allen*, 73 Ohio St.3d at 638, 653 N.E.2d at 687; *State v. Combs* (1991), 62 Ohio St.3d 278, 288-289, 581 N.E.2d 1071, 1080. In sum, proposition of law XIV lacks merit.

{¶ 77} In proposition of law XVII, appellant argues that the trial court violated his rights by instructing the jury, over his objection, that its decision in the penalty phase was a "recommendation." However, the trial court's use of that term accurately stated the law and did not constitute error. See, *e.g., State v. Phillips*, 74 Ohio St.3d at 101, 656 N.E.2d at 669; *State v. Grant* (1993), 67 Ohio St.3d 465, 472, 620 N.E.2d 50, 61.

{¶ 78} In proposition of law XV, appellant argues that he was denied his right to the effective assistance of counsel at trial. Reversal of convictions on grounds of ineffective assistance requires that the defendant show, first, "that counsel's performance was deficient" and, second, "that the deficient performance prejudiced the defense *** so as to deprive the defendant of a fair trial." *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

{¶ 79} However, the performance of appellant's counsel never fell "below an objective standard of reasonable representation." *State v. Bradley,* at paragraph two of the syllabus. Appellant complains that his counsel did not introduce evidence as to the Governor's 1982 sentence commutation. Yet, counsel could reasonably hold back this utterly irrelevant evidence. Counsel also reasonably chose against bifurcation on the death-penalty specification. Since appellant claimed self-defense and testified, his prior murder conviction would have been admissible as to his credibility regardless of bifurcation. See discussion on proposition of law IV.

**{¶ 80}** Counsel reasonably chose not to offer evidence of appellant's paranoid personality disorder at the guilt phase in view of the doubtful value and admissibility of such evidence at that stage. See *State v. Cooey* (1989), 46 Ohio St.3d 20, 26, 544 N.E.2d 895, 906; *State v. Wilcox* (1982), 70 Ohio St.2d 182, 24 O.O.3d 284, 436 N.E.2d 523 (psychiatric testimony unrelated to insanity is inadmissible to show defendant's incapacity to form intent). Moreover, appellant has not demonstrated that these tactical choices caused him prejudice, *i.e.*, that "were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, at paragraph three of the syllabus.

**{¶ 81}** Appellant also argues that his counsel should have objected further at trial to the jury instructions. However, appellant did not make that argument to the court of appeals. Thus, he waived that claim save for plain error. *State v. Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364. Moreover, counsel made some objections. Counsel need not raise meritless issues or even all arguably meritorious issues. Counsel's performance never fell below "an objective standard of reasonable representation," nor was the result of the trial affected by counsel's alleged errors. See *State v. Bradley*, at paragraphs two and three of the syllabus. We find that proposition of law XV lacks merit.

**{¶ 82}** In proposition of law XVI, appellant argues the trial judge did not give appropriate weight to mitigating evidence. However, "[a] decisionmaker need not weigh mitigating factors in a particular manner. The process ***, as well as the weight, if any, to assign a given factor is a matter for the discretion of the individual decisionmaker." *State v. Fox* (1994), 69 Ohio St.3d 183, 193, 631 N.E.2d 124, 132. Accord *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph two of the syllabus; *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph two of the syllabus. Appellant further argues that the mitigating factors outweigh the aggravating circumstance so that the death

penalty is inappropriate. This court's independent sentence determination will resolve that issue. We reject proposition of law XVI.

## VI

## Constitutionality

{¶ 83} In proposition of law XVIII, appellant challenges the constitutionality of Ohio's death penalty statute. We summarily reject this challenge. *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus. Ohio's death penalty statute is constitutional. See, *e.g., State v. Davis* (1992), 63 Ohio St.3d 44, 50, 584 N.E.2d 1192, 1197; *State v. Scott* (1986), 26 Ohio St.3d 92, 109, 26 OBR 79, 93-94, 497 N.E.2d 55, 69.

## VII

## Independent Review and Proportionality Analysis

{¶ 84} At the penalty phase of his trial, appellant presented several witnesses. Psychologist Dr. Rita J. Politzer concluded that appellant suffered from a "paranoid personality disorder" that made him overly excitable and suspicious. Appellant had a tendency to react violently to perceived affronts. Although the condition was amenable to treatment, appellant had never been treated for it. Politzer felt appellant could adjust to life in an institutional setting and had so adjusted during his prior prison term.

{¶ 85} Suette B. Steiner, who supervised appellant when he worked as a warehouseman, described appellant as intelligent and a very hard worker. Reverend Robert L. Doss testified that appellant, a member of Doss's congregation, was a man of God and a God-fearing man. Doss believed appellant's life should be spared because the Lord said, "Vengeance is mine."

{¶ 86} Constance M. Turner, the mother of appellant's seven-year-old son, felt sorrow and pity for the family of Marion Alexander, but did not believe appellant should be sentenced to death. Sharon Levett, appellant's older sister,

described appellant as a quiet and peaceable man who did not bother or bully people. She believed her brother acted in self-defense.

{¶ 87} In an unsworn statement, appellant expressed regret, but said he "didn't do anything that I wouldn't expect anyone else to do under the circumstances." Appellant could not believe the jury convicted him. Further, he stated, "I am a man, not a coward *** and, yes, I have been to Vietnam. I fought for this country *** and killed people that haven't done anything to me." Yet, he also felt that "when someone tries to do something to me, I cannot stand up and defend myself. *** I might as well let myself be shot." As to the 1974 murder conviction, appellant stated he pled guilty because he felt responsible and wanted others, who he felt were not responsible, to go free.

{¶ 88} After independent assessment, we find the evidence proves beyond a reasonable doubt the aggravating circumstance charged against appellant, *i.e.,* a prior murder conviction. R.C. 2929.04(A)(5). As to possible mitigating factors, the nature and circumstances of the offense provide some slight mitigating features. Alexander was the ex-lover of appellant's girlfriend. Appellant crossed paths with Alexander in the Club Seville, and both were drinking. It appears that jealousy may have played a part in the violence that ended the encounter. However, appellant's self-defense claims lacked credibility, as other witnesses did not support his account of events. Furthermore, appellant brutally shot Alexander, already wounded, as Alexander was lying on the floor.

{¶ 89} Appellant's history and background provide very few mitigating features. Little evidence was introduced on those points beyond that summarized above. Nothing in appellant's character appears to be mitigating.

{¶ 90} The evidence does not support finding that the victim "induced or facilitated" the offense. See R.C. 2929.04(B)(1). The jury rejected appellant's claims of self-defense, and Alexander's rude and obnoxious behavior, even if it occurred, did not establish that Alexander "induced" the offense.

{¶ 91} Defense testimony from appellant, Paul, and Roseborough could be interpreted to support an argument that appellant acted under "duress, coercion, or strong provocation" within the meaning of R.C. 2929.04(B)(2), and so provides at least some mitigation. Defense witnesses testified to a strained relationship between appellant and Alexander, and testified that Alexander attempted to humiliate appellant, and threatened and cursed appellant.

{¶ 92} Dr. Politzer's description of appellant's "paranoid personality disorder" does not establish the R.C. 2929.04(B)(3) mitigating factor, although the personality disorder is entitled to some mitigating weight as an "other factor" under R.C. 2929.04(B)(7). The mitigating factors in R.C. 2929.04(B)(4), (5) and (6) are not relevant to this case. Appellant was forty-four at the time of the offense, his criminal record was apparent, and he was the principal offender.

{¶ 93} As to the R.C. 2929.04(B)(7) "other factors," this court normally has accorded little weight to "personality disorders" as a mitigating "other factor." See *State v. Wilson* (1996), 74 Ohio St.3d 381, 401, 659 N.E.2d 292, 310; *State v. Hill* (1995), 73 Ohio St.3d 433, 447-448, 653 N.E.2d 271, 284. However, under the specific facts of this case, appellant's "paranoid personality disorder" may have caused him to feel especially threatened by Alexander's behavior, and to have overreacted to it. Nevertheless, while we accord some mitigating weight to this factor, its mitigation value is not great. We give no weight to residual doubt. No "other factors" are mitigating. There is little evidence that appellant expressed remorse at trial, and no other possible mitigating features are apparent.

{¶ 94} We find that the aggravating circumstance outweighs the combined mitigating factors beyond a reasonable doubt. Having previously been convicted of the murder of two persons, appellant was incarcerated. Yet, ten years after his release, he murdered again. A prior murder conviction can be even more grave than other aggravating circumstances. See *State v. Carter* (1992), 64 Ohio St.3d 218, 228, 594 N.E.2d 595, 602.

{¶ 95} The very strong aggravating circumstance here, appellant's prior conviction for the murder of two persons, outweighs beyond a reasonable doubt all of his mitigation evidence. Appellant has murdered three persons; he committed his third murder after he had been tried, convicted, and served eight years in prison for the first two murders. In view of these circumstances, the death penalty is appropriate.

{¶ 96} The death penalty is both appropriate and proportionate when appellant's case is compared with similar capital cases. See *State v. Carter*, 64 Ohio St.3d 218, 594 N.E.2d 595; *State v. Davis*, 63 Ohio St.3d 44, 584 N.E.2d 1192; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373; *State v. Mapes* (1985), 19 Ohio St.3d 108, 19 OBR 318, 484 N.E.2d 140.

{¶ 97} Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

DOUGLAS, F.E. SWEENEY, COOK and LUNDBERG STRATTON, JJ., concur.

MOYER, C.J., and PFEIFER, J., dissent.

————————————

**MOYER, C.J., dissenting.**

{¶ 98} Because the evidence in this case is insufficient to permit a finding of "prior calculation and design," a necessary element for the offense of aggravated murder in R.C. 2903.01(A), I would set aside Taylor's conviction for aggravated murder and the resulting death sentence. Therefore, I respectfully dissent.

{¶ 99} As the majority observes, in 1974 the General Assembly reclassified first-degree murder as "aggravated murder" and substituted a requirement of "prior calculation and design" to replace the more traditional requirement of "deliberate and premeditated malice." (134 Ohio Laws, Part II, 1866, 1900, Am.Sub. H.B. No. 511.) See *State v. Jenkins* (1976), 48 Ohio App.2d 99, 2 O.O.3d 73, 355 N.E.2d 825. R.C. 2903.01(A), amended in 1981, retained the term "prior calculation and

design" as a necessary element of aggravated murder. (139 Ohio Laws, Part I, 1, 3.)

**{¶ 100}** According to the 1973 Technical Committee Comment to Am. Sub. H.B. No. 511, R.C. 2903.01 "restates the former crime of premeditated murder so as to embody the classic concept of the planned, cold-blooded killing while discarding the notion that only an instant's prior deliberation is necessary."

**{¶ 101}** In *State v. Cotton* (1978), 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190, at paragraph one of the syllabus, we agreed that "'prior calculation and design' is a more stringent element than the 'deliberate and premeditated malice' which was required under prior law." The General Assembly's apparent intention "was to require more than the few moments of deliberation permitted in common law interpretations of the former murder statute, and to require a scheme designed to implement the calculated decision to kill." *Cotton* at 11, 10 O.O.3d at 6, 381 N.E.2d at 193. Also, in *Cotton*, we held that "[i]nstantaneous deliberation is not sufficient to constitute 'prior calculation and design.'" *Cotton*, at paragraph two of the syllabus. I would reiterate that holding today.

**{¶ 102}** Taylor asserts in this case that the evidence is insufficient to permit a finding of prior calculation and design. I agree. When the evidence is viewed in a light most favorable to the prosecution, as required by *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, I believe the jury could not have reasonably found the required element of prior calculation and design.

**{¶ 103}** In *State v. Jenkins*, 48 Ohio App.2d at 102, 2 O.O.3d at 75, 355 N.E.2d at 828, the court of appeals set out three factors to be considered in determining the existence of prior calculation and design: (1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or "an almost instantaneous eruption of events"?

{¶ 104} The evidence here showed only two or three minutes had passed between the jukebox confrontation and the time when Taylor shot Marion "Donny" Alexander. According to a barmaid, Donny and Taylor glared at each other "for a couple of seconds" when Taylor told Donny to "[p]ut your own dollar in there." The men glared at each other a "couple of more seconds" before Sandra Paul ("Sandra") walked back to where Taylor was sitting. According to Darlene Youngblood, there "wasn't a minute" between when Taylor last told Donny to "[p]ut your own *** dollar in the box," and when Taylor told Sandra, "Let's go." Shortly thereafter, Sandra got up to leave, Taylor followed her, and then shot Donny on the way out in "maybe about a minute."

{¶ 105} Admittedly, Sandra had introduced Taylor to Donny in the same bar some time before the night of the murder. When Donny had met Taylor then, Donny privately warned Sandra not to "be bringing him [Taylor] in my bar." Sandra claimed she only told Taylor about the warning later. According to Taylor, Donny had a "nasty attitude" and elbowed him when they previously met. Thus, Donny and Taylor had met before, and their relationship was strained.

{¶ 106} On the night of the murder, defense witnesses claimed Donny was loud and boisterous. Taylor testified he thought Donny tried to humiliate him by flashing around a big roll of money and saying, "If a nig *** ain't got no money, he ain't shit." Donny also "stared" at Sandra and Taylor when they were dancing earlier that night.

{¶ 107} While this evidence indicates a strained relationship between Taylor and Donny, the evidence does not establish, beyond a reasonable doubt, that Taylor had planned to kill Donny. It is equally plausible that their encounter at the bar that night was totally coincidental. Significantly, Donny was not even at the bar when Taylor arrived. No evidence was introduced that Taylor chose that bar as a murder site, or that he lay in ambush for Donny, or that he even knew Donny would be there that particular evening. See *State v. Jenkins*, *supra*.

{¶ 108} After the jukebox incident, David Roseborough claimed that Donny called Taylor a "bitch" and a "punk, hip mother fucker" and invited him several times to fight. Donny also told Taylor, "Mother fucker, these are my friends up here *** [in this bar]. I say and do what I want to do in here." As Sandra left the bar, Donny reportedly told her, "Bitch, I told you not to bring this mother fucker up here to my bar."

{¶ 109} Despite these circumstances, I would hold the evidence insufficient to permit a finding that Taylor engaged in more than "instantaneous deliberation" in planning to kill Donny, as *Cotton* requires. Evidence of bad blood or a strained relationship between persons is simply not, by itself, sufficient to show that one planned to kill another. While Taylor did take a gun to Club Seville, the prosecution never claimed at trial that when he did so, he planned or intended to kill Donny. See *State v. Jenkins*. Up to the very moment of the jukebox incident, Donny and Taylor had not confronted each other. The time between the jukebox incident and the shooting was very short, two or three minutes at most. No evidence exists that Taylor planned and deliberated to kill Donny in that brief space of time. In fact, Taylor had expressed his intention to leave the bar, and actually began to leave, *after* the jukebox incident. This case simply falls short of the degree of calculation envisioned by the General Assembly when it adopted the term "prior calculation and design" effective in 1974 as part of Am.Sub.H.B. No. 511.

{¶ 110} Taylor did shoot Donny seven times, including several times as Donny was lying on the floor. That fact demonstrates Taylor's anger at the moment and proves beyond a reasonable doubt that he intentionally killed Donny. Such intent, however, is not the equivalent of prior calculation and design.

{¶ 111} When the General Assembly adopted the more stringent "prior calculation and design" requirement, its precise purpose was to distinguish short-lived eruptions of violence from the more traditional first-degree premeditated and planned killings. The evidence adduced at trial indicates the altercation that

resulted in Donny Alexander's death was "an almost instantaneous eruption of events." *State v. Jenkins*.  Established Ohio law requires more than instantaneous deliberation to support a finding of prior calculation and design.  *Cotton*.

{¶ 112} Accordingly, I would reverse the court of appeals' judgment affirming Taylor's guilt of the offense of aggravated murder and vacate his sentence of death.

PFEIFER, J., concurs in the foregoing dissenting opinion.

_____