OPINION
Defendant-appellant, Andrew J. Beckman, appeals his conviction in the Warren County Court of Common Pleas for aggravated murder. We affirm the decision of the trial court.
Brandy Southworth was stabbed to death on Sunday, July 25, 1999. Brandy was appellant's girlfriend, and they had a child together. Appellant was arrested on the night of Brandy's murder after he was found lying facedown on the front lawn of a friend's house near the scene of the crime. Appellant was wearing dark clothes, had blood on his hands, and identified himself as Brandy's killer.
At a bench trial, there was testimony by several friends and acquaintances of appellant and Brandy. Eighteen-year-old Joshua Johnson ("Josh") testified that he had known Brandy and appellant for about two and one-half years and was friends with both of them. Josh's wife, sixteen-year-old Amanda Woods, testified that she had known Brandy for about two years and appellant for about two and one-half years. On the day before the murder, appellant and Brandy visited Josh and Amanda at their home. At one point during the visit, Josh heard Brandy yell. Brandy said that appellant had kicked her. Josh asked appellant to leave and told him not to come back that day. As appellant was leaving, Brandy told him that she would see him in court. Appellant replied, "he wasn't going to jail for nothing." Appellant told Josh that he did not like Brandy anymore and that she was keeping him from seeing his friends.
Tara Hennekes testified that she lived with her husband, Zachary Hennekes, and his brother, Chris Hennekes, at 302 Miami Street in Morrow. Tara knew appellant for about six years and appellant had introduced her to Brandy. Zachary was a friend of appellant's and had known him for five or six years. Tara explained that she wanted to help Brandy find a job, and told Brandy she would help Brandy care for her son; therefore, she invited Brandy to stay at their home. Brandy accepted Tara's offer and moved into the Hennekes' house.
On the day before the murder, Tara noticed bruises on Brandy. Appellant admitted that he had hit Brandy once and stated that he was going to get counseling. Tara described the relationship between appellant and Brandy as "kind of on and off" but explained that Brandy had decided on Saturday that she wanted to finally break up with appellant. At that time, Brandy had been living with the Hennekes for less than one week. Tara asked Chris to tell appellant that he was not welcome at their home.
Chris testified that he talked to appellant on the phone at about 9:00 Sunday evening. During their conversation, Chris told appellant to stay away from the Hennekes' home. Chris also testified that he had heard appellant and Brandy arguing the day before the murder. He heard Brandy say to appellant, "Are you happy now?" Appellant replied, "I should have killed you." Two weeks earlier, Chris had talked to appellant about an appearance appellant had made in court on a domestic charge based on an incident involving Brandy. In their discussion, appellant said "he should just go ahead and kill her because he was going to go to jail anyways [sic]."
Andrew Batsche testified that he had appeared in Warren County Court about two weeks before the murder on July 6, 1999 with appellant, who had been charged with domestic violence; the case was placed on a six-month pretrial diversion.
After receiving a warning from Chris to stay away from the Hennekes' house, appellant walked from his home in Blanchester to Morrow and stopped to see Josh at his home. Josh and appellant talked for a while, and appellant again expressed frustration with the fact that he could not see any of his friends anymore.
Steven Ernst, Brandy's brother-in-law, testified that he spoke with Brandy on the telephone on the night of the murder. Brandy called him at 11:20 p.m., and they talked until about 11:45 p.m. They discussed the problems she was having with appellant. Brandy told Steven that she was very afraid because she was alone at the Hennekes' house and appellant had said that he was going to kill her. Steven told Brandy to call 911 or a neighbor or to leave the house. Steven, who lived in Milford, offered to pick Brandy up, but she declined and said that she would be fine.
After talking to Steven, Brandy called Amanda. Amanda was at home when she received the call from Brandy around midnight. Brandy asked Amanda if she would come over because she thought she heard someone outside. Amanda said that she could not leave because she was babysitting but handed the telephone to Josh so that Brandy could ask him to come.
When Josh talked to Brandy on the telephone, she asked him if he would walk Amanda over to the Hennekes' house. Then Brandy said that she thought someone was breaking into the house. Brandy screamed. Josh immediately hung up the phone, put on his shoes, and ran through the neighborhood to the Hennekes' house. Josh testified that it probably took him about five minutes to reach the house. When he arrived, he saw Brandy lying in a pool of blood.
Betty Miller testified that she was outside her home on Miami Street in Morrow when she heard a confrontation next door. Someone said "No, no," and then Betty heard a scream. Betty heard the sound of hitting, and she then went to see what was happening. She walked to her next-door neighbor's patio, stepped around the porch, and saw a man "on top of another person, stabbing them." Betty watched the man use both hands on a knife and stab his victim five times. The victim was not resisting, and the stabs were to the chest area. Betty ran back to her home. She told her husband that she had "witnessed a murder" and he called the police.
Appellant went to Amanda and Josh's house and told Amanda to "call the cops." When she asked him why, he said "because I need to go to jail." Amanda did not ask appellant to come in but shut the door and called the police.
Deputy John Cresap from the Warren County Sheriff's Department arrived at the Hennekes' home at about 12:06 a.m. As soon as the light from his spotlight hit the house, he saw a very large pool of blood and Brandy lying dead on the ground. There was a butcher knife stuck into the ground above Brandy's head. Brandy's baby was inside the house crying.
As Josh ran back toward his home, he saw appellant on the porch and yelled his name. Then a police officer passed, and Josh turned his head toward the police officer. When he looked back, he did not see appellant. Harry Lydon, a Morrow police officer, exited his patrol car and began walking towards Josh's door. The police officer aimed his flashlight at the ground and found appellant lying facedown in the yard. Although it was a very warm and humid summer evening, appellant was wearing a black shirt, black jeans, and black boots. Josh said, "I think he killed her." Officer Lyndon asked, "Who?" Appellant answered, "I did. I'm the one you're looking for." Appellant was handcuffed and taken into custody.
Detective J.R. Abshear from the Warren County Sheriff's Department investigated the homicide scene. The victim's blood was found on the blade of the knife that had been thrust into the ground near Brandy's body. Brandy had stab wounds to the chest, lacerations to the chest, and a cut down the side of her face. She also had multiple stab wounds to her back. There was no sign of a struggle in the house. The crime lab results indicated that the blood on appellant's shirt and on his hands was the victim's blood.
Travis Woods testified that he had known appellant for three and one-half to four years and that they were friends. Appellant sent Travis a letter from jail, in which appellant tried to explain why he had killed Brandy. The letter concluded with the words, "Just another nigger who killed a poor defenslis [sic] white girl."
During closing argument, the defense admitted, "there's no question that Andrew did kill Brandy Southworth." However, the defense argued that the state had failed to prove that appellant had acted with prior calculation and design.
A trial court judge found appellant guilty of aggravated murder and sentenced appellant to life in prison. Appellant appeals, raising a single assignment of error:
 THE COURT'S FINDING THE APPELLANT GUILTY OF AGGRAVATED MURDER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Appellant argues that his conviction for aggravated murder was against the manifest weight of the evidence because the state failed to prove beyond a reasonable doubt that he acted with prior calculation and design.
A reviewing court will not reverse a judgment as against the manifest weight of the evidence in a bench trial where the trial court could reasonably conclude from substantial evidence that the state has proved the offense beyond a reasonable doubt. State v.Eskridge (1988), 38 Ohio St.3d 56, 59. The standard for reversal based upon the manifest weight of the evidence has been summarized as follows:
 The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
 State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting Statev. Martin (1983), 20 Ohio App.3d 172, 175. In making this analysis, the reviewing court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and the weight to be given the evidence. State v.DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
In his brief, appellant also appears to argue that there was insufficient evidence to sustain his conviction. The standard of review of a claim of insufficient evidence was established inState v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus:
 An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (Jackson v. Virginia [1979], 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, followed.)
Appellant was convicted of aggravated murder. R.C. 2903.01, which establishes the offense of aggravated murder, states in relevant part, "[n]o person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy." R.C. 2903.01(A).
In his brief, appellant argues that instantaneous deliberation does not constitute "prior calculation and design," and that appellant was provoked by the victim to use deadly force. Appellant contends that because the state failed to prove beyond a reasonable doubt that appellant committed the murder with prior calculation and design, his conviction was against the manifest weight of the evidence.
The Supreme Court of Ohio has stated that it is not possible to establish a "bright-line test that emphatically distinguishes between the presence or absence of `prior calculation and design.'" State v. Goodwin (1999), 84 Ohio St.3d 331, 344, quoting State v. Taylor (1997), 78 Ohio St.3d 15, 20. When determining whether prior calculation and design is present, there is no single set of factors to be applied; instead, "each case turns on the particular facts and evidence presented at trial."Id. Where a defendant assaulted the victim four days before the murder and then, on the day of the murder, broke into a home, killed the victim, and quickly fled the scene, the supreme court determined that there was "a calculated plan of attack swiftly carried into execution." State v. O'Neal (2000), 87 Ohio St.3d 402,412. Such action warranted a conviction for aggravated murder.
In this case, there was evidence that appellant had recently threatened to kill Brandy. On the night of the murder, Chris called appellant and warned him to stay away from the Hennekes' home. Appellant also was asked to leave Josh and Amanda's home after fighting with Brandy. Appellant spoke with Josh hours before the murder and complained that Brandy was keeping him from seeing his friends.
Appellant was dressed completely in black. An examination of the knife used to kill Brandy revealed that it was ten inches long and was manufactured by Carver Hall. Tara testified that all of the knives in her home were Farberware brand and had handles that were a different color than the handle of the knife used in the murder. Therefore, a reasonable inference would be that appellant dressed in black, took a knife, and went to the Hennekes' home with the intention of killing Brandy. Although appellant argues that there was a fight between Brandy and him and that she provoked him, the weight of the evidence does not support that theory. Josh was speaking to Brandy on the telephone when he heard her scream. When Josh arrived at the Hennekes' home five minutes later, Brandy was already dead and appellant had fled the scene. There was no sign of a struggle in the house.
Reviewing the entire record and weighing the evidence and the reasonable inferences, we find that the conviction is supported by the manifest weight of the evidence. Moreover, reviewing the evidence in a light most favorable to the prosecution, a rational trier of fact could find that the elements of aggravated murder were proven beyond a reasonable doubt. Therefore, we also find that the record contains sufficient evidence to support appellant's conviction. The assignment of error is overruled.
YOUNG, P.J., and WALSH, J., concur.