OPINION
{¶ 1} This is an appeal by appellant, Carl K. Jackson, from a judgment of sentence and conviction entered by the Franklin County Court of Common Pleas, following a jury trial in which appellant was found guilty of aggravated robbery and felonious assault.
{¶ 2} On January 4, 2002, appellant was indicted on one count of aggravated robbery, in violation of R.C. 2911.01, two counts of robbery, in violation of R.C. 2911.02, and one count of felonious assault, in violation of R.C. 2903.11. Each of the counts carried a firearm specification.
{¶ 3} The indictment arose out of an incident on December 4, 2001, in which Joseph C. Craft was shot while sitting in his vehicle in the parking lot of the Central Point Shopping Center, located at 612 Harrisburg Pike. The matter came for trial before a jury beginning February 7, 2003.
{¶ 4} Craft, the shooting victim, gave the following testimony at trial. In 2001, Craft was employed as a car salesman. In the latter part of that year, someone approached him about selling marijuana, and Craft agreed to do so because he needed additional money for his mortgage payment and to purchase Christmas gifts for his children. According to Craft, he had been selling marijuana for two weeks prior to the time he was shot.
{¶ 5} A few days before the shooting incident, Tyrone King, an acquaintance of Craft, called Craft and stated that he knew somebody who was looking for a "bag of weed." (Tr. 120.) As a result of that conversation, Craft met an individual, identified at trial as appellant, and appellant gave Craft his phone number. Appellant and Craft subsequently spoke by telephone, and appellant asked Craft to meet him at a particular location, but Craft felt uneasy about the situation and he declined.
{¶ 6} Craft and appellant eventually made arrangements to meet December 4, at 3 p.m., in the Big Bear parking lot at the Central Point Shopping Center. Shortly before the meeting, Craft obtained a handgun from his brother-in-law "because of the feeling I was having." (Tr. 127.) Craft drove to the parking lot and was in communication with appellant by cell phone; appellant indicated that he was parked in a maroon car. Craft parked next to appellant's vehicle, and Craft noticed that another individual was in the vehicle with appellant. Appellant walked over to the passenger door of Craft's truck, entered the vehicle, and asked Craft to show him the marijuana. Craft handed appellant a portion of the marijuana, and appellant stated that he wanted to show it to his cousin. Appellant got out of the truck and showed the other individual the marijuana. Appellant returned and stated that his cousin wanted the drugs.
{¶ 7} The man identified as appellant's cousin then came over and entered the passenger side of Craft's truck. Craft thought the man was reaching for money, but instead he pulled out a gun and stated, "nigger, I'll kill you in this truck if you don't give it to me." (Tr. 125.) The man began nudging Craft with the gun, and when the man put the gun near Craft's head, Craft "smacked the gun down and punched him." (Tr. 126.) The two men struggled for a brief period, and Craft eventually reached for his own weapon, but as he put his head down, the other man said, "lights out, nigger." (Tr. 126.) The man pulled the trigger, shooting Craft in the neck. The assailant then took a four-ounce bag of marijuana that Craft had brought to the meeting.
{¶ 8} Craft collapsed over the truck's console, and was momentarily unable to move. He was, however, able to see the clock on the dashboard, and he recalled that it displayed 3:24 p.m. when the shooting occurred. Eventually, Craft was able to reach up with his hand and activate the vehicle's horn, attracting someone's attention, and police officers and medical personnel were summoned a short time later. Craft provided the police officers with the name Tyrone King since King had set up the meeting and knew the individual Craft was supposed to meet; Craft did not state that King shot him.
{¶ 9} Craft's central nervous system was damaged as a result of the shot entering his neck and striking his vertebrae. For a number of weeks, he was a quadriplegic, and was hospitalized for almost five months. At trial, Craft was able to walk with a cane.
{¶ 10} On the date of the incident, Columbus Police Officer James Long and his partner were dispatched to the shooting scene. Upon arriving, Officer Long observed that the victim had been shot in the neck. The officers asked Craft who had shot him, and he responded, "Tyrone King." (Tr. 29.) Craft later mentioned another individual, and indicated that the man's phone number was in his truck. Craft stated that the men had left in a maroon Buick or an Oldsmobile. Officer Long observed marijuana outside the vehicle on the ground.
{¶ 11} Columbus Police Detective Marilyn Seamans interviewed Craft in a hospital emergency room on the date of the incident. Detective Seamans noticed a stippling effect on appellant's skin, indicating that he had been shot at close range. Craft told the detective that Tyrone King had set up a drug deal, but Craft did not know the name of the individual who shot him.
{¶ 12} Robert Lawson, a latent fingerprint examiner, examined prints recovered from the crime scene, and he identified a fingerprint lift taken from Craft's truck as matching appellant's fingerprint. Lawson also identified a fingerprint lift taken from the truck as matching the fingerprint of an individual named Roosevelt Bradford.
{¶ 13} Columbus Police Officer Steve Eppert created photographic arrays as part of the investigation. On December 12, 2001, detectives showed Craft an array, and he stated that photograph No. 3, depicting an individual named Lance Green, looked the most like the person driving the getaway car, but Craft was not completely certain of the identification. Officer Eppert created a second photographic array that included appellant's picture, and detectives showed the array to Craft on December 13, 2001. Craft chose appellant's photograph as one of the individuals involved in the incident; while Craft was certain of his identification, he indicated that appellant was not the shooter. On December 28, 2001, a third photographic array, which included Roosevelt Bradford's photograph, was shown to Craft, and he identified Bradford as the individual who shot him.
{¶ 14} Appellant was arrested on December 27, 2001, and Columbus Police Detectives John Weis and Edward Kallay conducted an interview of the suspect. During the interview, appellant acknowledged that he had been present at the time of the shooting incident along with an individual named Roosevelt. Appellant's cousin, Otis Vaughn, was also in close proximity to the shooting scene. Appellant related that they did not have any money with them, and that robbery was their motive; appellant, however, did not want to be the one to rob Craft because he had "met him [Craft] through my friend." (Tr. 184.) Appellant acknowledged getting out of the car first and looking at the marijuana in Craft's truck. Appellant told the detectives that Vaughn had provided Roosevelt with the weapon. During the incident, Vaughn was standing near a restaurant at the strip mall, looking out for police. After the shooting, Vaughn got in the backseat of the vehicle that appellant was driving, while Roosevelt rode in the front passenger seat. Appellant told detectives that, following the incident, he drove directly to his probation officer's office because he was late for an appointment. Appellant, Vaughn and Bradford divided the marijuana taken from Craft's vehicle.
{¶ 15} At the time of the interview with detectives, appellant placed a cell phone call to Roosevelt Bradford, and the detectives taped the conversation. Bradford discussed the shooting with appellant, relating that the victim "went reaching for something, and he got shot in the side of the head somewhere." (Tr. 180.)
{¶ 16} Larry Mead is a Franklin County probation officer, who has in the past supervised appellant. On December 4, 2001, appellant reported to Mead at the probation office at 3:45 p.m. Mead stated that the Central Point Shopping Center is located approximately two miles from the probation department and that, had appellant been involved in an incident at that location at approximately 3:25 p.m., he would have had sufficient time to report to the probation department by 3:45 p.m.
{¶ 17} Appellant testified on his own behalf and stated that he has known Joseph Craft for approximately two years, having met him through another friend, Tyrone King. Appellant contacted King and told him that he knew someone who "needed some weed." (Tr. 235.) According to appellant, he had an ongoing business relationship with Craft, whereby appellant would sell marijuana for Craft, and appellant would receive a kickback from every sale. Appellant testified that, on the day of the shooting incident, he had no intention to rob Craft because he was getting money from Craft as a result of the sale.
{¶ 18} Following the shooting incident, appellant told Detective Kallay that he knew what had happened, but that he had nothing to do with it. Detective Kallay advised appellant to come to the station and speak to Detective Weis.
{¶ 19} On cross-examination, appellant acknowledged that, during the interview with detectives, he stated that he and the others went to the shopping center planning to rob Craft, but appellant claimed he was "told to say that." (Tr. 239.) Appellant claimed that detectives made threats that he would receive 13 years' incarceration if he did not make a statement. (Tr. 239.) Appellant denied driving the car after the shooting. According to appellant, after he heard the shot in the parking lot, he got out of the maroon car and walked to a bus stop and took a COTA bus to see his probation officer. Appellant did not call for assistance for Craft because he was "in shock." (Tr. 244.)
{¶ 20} The state called Detectives Weis and Kallay as rebuttal witnesses. Both detectives denied telling appellant what to say during the interview at the police station. Detective Kallay testified that he had several previous contacts with appellant in which appellant provided information to the detective regarding other cases. On December 7, 2001, Detective Kallay met with appellant, at which time appellant was arrested on outstanding warrants. During the subsequent interview with detectives, appellant confessed to having a role in the shooting incident, stating that their intent was to rob the victim of the marijuana.
{¶ 21} At trial, the state moved to dismiss counts two and three of the indictment, and the court dismissed those counts prior to the time the case was submitted to the jury. The jury returned verdicts finding appellant guilty of aggravated robbery, as charged in count one, and felonious assault, as charged in count two of the re-numbered indictment. The trial court conducted a sentencing hearing on February 20, 2003, and the court sentenced appellant by entry filed February 24, 2003. The trial court filed a corrected judgment entry April 2, 2003.
{¶ 22} On appeal, appellant sets forth the following three assignments of error for review:
 First Assignment of Error
The trial court erred by imposing greater that [sic] the minimum allowable sentence without specifically finding the factors set forth in R.C. 2929.14(B).
 Second Assignment of Error
The trial court erred in ordering the sentences to be served consecutively when the record did not demonstrate the factors enumerated in R.C. 2929.14(E)(4).
 Third Assignment of Error
Appellant's convictions are against the manifest weight of the evidence.
{¶ 23} Appellant's first and second assignments of error, challenging the trial court's imposition of nonminimum and consecutive sentences, will be addressed together. Appellant first argues that the trial court erred in failing to make, pursuant to R.C. 2929.14(B), oral or written findings necessary to support the imposition of greater than the minimum sentence where appellant had not previously been sentenced to prison. Appellant next contends that the trial court erred in failing to provide any reasons for imposing consecutive sentences as required under R.C. 2929.14(E).
{¶ 24} Pursuant to R.C. 2929.14(B)(2), if the trial court imposes a prison sentence upon an offender who has not previously served a prison term, the court "shall impose the shortest prison term authorized for the offense * * * unless * * * [t]he court finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others." R.C. 2929.14(E)(4) addresses the imposition of consecutive sentences, and under that statute a trial court may require an offender to serve multiple prison terms consecutively if the court finds that: "(1) the consecutive sentences are necessary to protect the public from future crime or to punish the offender; (2) the consecutive terms are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) one of the factors listed in R.C. 2929.14(E)(4)(a) through (c) applies." State v. Patterson, Butler App. No. CA2001-09-222, 2002-Ohio-5996, at ¶ 23.
{¶ 25} We note that the Ohio Supreme Court has recently held that, "[p]ursuant to R.C. 2929.14(E)(4) and 2929.19(B)(2)(c), when imposing consecutive sentences, a trial court is required to make its statutorily enumerated findings and give reasons supporting those findings at the sentencing hearing." State v. Comer, 99 Ohio St.3d 463,2003-Ohio-4165, paragraph one of the syllabus. Further, the court in Comer, at paragraph two of the syllabus, held that, "[p]ursuant to R.C.2929.14(B), when imposing a nonminimum sentence on a first offender, a trial court is required to make its statutorily sanctioned findings at the sentencing hearing." In the present case, while the state maintains that the trial court gave sufficient reasons for imposing a lengthy prison term, the state concedes that the court failed to make the findings required by R.C. 2929.14(B) and (E)(4), and thus acknowledges that the case must be remanded for resentencing. Upon review, we agree.
{¶ 26} Regarding the trial court's decision to impose greater than the minimum sentence, the record fails to show that the court made an express finding that the shortest prison term would demean the seriousness of appellant's conduct or would not adequately protect the public from future crime by him or others. As to the issue of consecutive sentences, while the trial court made comments that we construe as finding that consecutive sentences are not disproportionate to the seriousness of the offender's conduct, the record fails to indicate that the court engaged in the full analysis and findings required for imposing consecutive sentences. See State v. Morrison (Dec. 31, 2001), Franklin App. No. 01AP-714 (At the sentencing hearing, the court not only must "specify its findings from among those set forth in R.C. 2929.14[E][4], but it must also specify one of the findings set forth in R.C.2929.14[E][4][a], [b], or [c]," as well as "specify its reasons in support of those findings pursuant to R.C. 2929.19[B][2][c]").
{¶ 27} Accordingly, we sustain appellant's first and second assignments of error to the extent that this matter is remanded for the trial court to make the necessary findings under R.C. 2929.14(B), as well as to make the requisite findings and reasons mandated by R.C.2929.14(E)(4).
{¶ 28} Under the third assignment of error, appellant asserts that his convictions are against the manifest weight of the evidence. Appellant argues that he repeatedly testified at trial that he did not want to participate in the robbery of Craft, and that the evidence fails to suggest that he anticipated or expected that Bradford's robbery of Craft would result in a shooting.
{¶ 29} We note that appellant does not challenge, under this assignment of error, the sufficiency of the evidence, which requires a reviewing court to construe the evidence in a light most favorable to the prosecution and determine if any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. The legal concepts of sufficiency of the evidence and weight of the evidence are not the same. State v. Thompkins (1997), 78 Ohio St.3d 380,386. In Thompkins, at 387, the court discussed the concept of manifest weight of the evidence as follows:
Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. * * * Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." * * *
When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. * * * See, also, State v. Martin (1983), 20 Ohio App.3d 172, 175 * * *[.] ("The trial court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.").
(Some citations omitted; emphasis sic.)
{¶ 30} As noted, appellant was convicted of aggravated robbery and felonious assault. R.C. 2911.01 sets forth the elements of aggravated robbery, and that statute in general prohibits any person, in attempting or committing a theft offense, from having a deadly weapon on or about his person or under his control, or from inflicting, or attempting to inflict, serious physical harm on another. R.C. 2903.11 sets forth the elements of felonious assault, and prohibits any person from knowingly causing serious physical harm to another or causing or attempting to cause physical harm to another by means of a deadly weapon or dangerous ordnance. In addition to instructing the jury on the above offenses, the trial court also gave instructions on complicity by aiding and abetting.
{¶ 31} Appellant's primary contention is that the jury should have accepted his testimony that he had no intention of participating in a robbery because Craft was a business associate with whom appellant shared drug sale profits. The trier of fact, however, was faced with conflicting testimony. While appellant denied he intended to rob Craft, the state presented contrary evidence, including appellant's own statements from a taped interview with detectives, in which he acknowledged that neither he nor his cousin had any money, and that their motive was to rob Craft of the marijuana.
{¶ 32} In order to support a conviction for complicity by aiding and abetting under R.C. 2923.03, "the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." State v. Johnson (2001), 93 Ohio St.3d 240, syllabus. Such evidence may be inferred from presence, companionship and conduct before and after an offense is committed. State v. Cartellone (1981), 3 Ohio App.3d 145, 150. Further, "[a]iding and abetting may also be established by overt acts of assistance such as driving a getaway car or serving as a lookout." Id. See, also, State v. Trocodaro (1973), 36 Ohio App.2d 1, 6.
{¶ 33} In the present case, the evidence presented went beyond appellant's "mere presence at the scene." Cartellone, supra, at 151. Rather, there was evidence that, if believed, indicated that the common motive of appellant, Bradford, and Vaughn was to rob Craft of the marijuana, and that appellant knew Bradford was armed at the time. As noted, appellant set up the meeting for the purported drug purchase and later acknowledged to detectives that neither he nor Bradford had any money to make the purchase. There was also evidence that, if believed, showed that appellant drove the getaway car after the incident and shared in the marijuana taken from the victim. Although appellant attempted to portray his statements during the interview as coerced or scripted by detectives, both Detectives Weis and Kallay testified on rebuttal that they did not tell appellant what to say during the interview, and the jury was free to believe or disbelieve their testimony, as the credibility of the witnesses and the weight to be given their testimony are matters for the trier of fact to resolve. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. Here, it is clear that the jury, based upon the state's evidence to the contrary, chose to reject appellant's testimony that he did not intend to commit a robbery.
{¶ 34} Further, regarding the conviction for felonious assault, despite appellant's claim that he did not anticipate or expect that Craft would be shot, appellant acted in a manner that aided and abetted the shooting. Specifically, there was evidence from which the jury could find that appellant participated in a common plan to rob Craft, and that appellant knew that a weapon was to be employed in the commission of the offense. It has been held that, pursuant to R.C. 2923.03, the culpability necessary to sustain the conviction of an aider and abettor "will be presumed where the crime committed by a principal in furtherance of a common design to commit a criminal offense reasonably could have been contemplated by the aider and abettor as a natural and probable consequence of the commission of that criminal offense." State v. Hedrick (Feb. 18, 1988), Cuyahoga App. No. 53422. Thus, "[w]hen a defendant acts as part of a common scheme with full awareness of the use of a deadly weapon, that defendant is criminally liable for the acts committed by the principal." Id. See, also, State v. Jester (1987), 32 Ohio St.3d 147, 152
(In situations where an inherently dangerous weapon is employed during the commission of a felony, resulting harm to a victim is a "natural and probable consequence presumed to have been intended"). Again, the jury found unconvincing appellant's claim that he did not intend to participate in the plan to rob Craft, and there was evidence upon which the jury could have found that the serious physical harm caused to the victim was a natural and probable consequence of the plan entered into by appellant and his accomplices.
{¶ 35} Based upon the record in this case, we conclude that the jury did not lose its way and create a manifest miscarriage of justice when it convicted appellant of complicity in the commission of the offenses. Accordingly, appellant's convictions are not against the manifest weight of the evidence, and appellant's third assignment of error is overruled.
{¶ 36} Based upon the foregoing, appellant's first and second assignments of error are sustained to the extent that this matter will be remanded for resentencing; however, the third assignment of error is overruled, and we affirm appellant's convictions. Accordingly, the judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part, and this matter is remanded to that court for further proceedings in accordance with law and consistent with this opinion.
Judgment affirmed in part and reversed in part; cause remanded.
Petree, P.J., and Bryant, J., concur.