OPINION
{¶ 1} This is an appeal by defendant-appellant, Ronnie J. McWhorter, from a judgment of sentence and conviction entered by the Franklin County Court of Common Pleas, following a jury trial in which appellant was found guilty of aggravated murder. For the reasons that follow, we affirm the judgment of the trial court.
 {¶ 2} On January 18, 2007, appellant was indicted on one count of aggravated murder in violation of R.C. 2903.01. The indictment arose out of the death of Howard Hough on January 10, 2007. *Page 2 
 {¶ 3} The matter came for trial before a jury beginning February 26, 2008. The first witness for the state was Heather Moore, whose testimony indicated the following. In January of 2007, Moore resided with her boyfriend, Paul Fugate, at 497 East Morrill Wood Park. Appellant and his wife, Angel McWhorter ("Angel"), lived in a duplex next to Moore and Fugate at 499 East Morrill Wood Park. Appellant's mother, Patricia McWhorter ("Patricia"), lived for a period of time at appellant's residence. Howard "Buddy" Hough, Patricia's boyfriend, also stayed "off and on" at appellant's duplex. (Tr. 34.)
 {¶ 4} On the evening of January 10, 2007, Moore heard yelling at appellant's duplex. Moore also heard the sound of something breaking. Moore was worried about appellant's children, so she went over to appellant's residence. Patricia was upset, and she was upstairs breaking glass picture frames in a bedroom. Other individuals were downstairs playing cards at the time. Patricia then came downstairs, and was "cussing and arguing" with appellant. Appellant told his mother to leave, and Patricia indicated she needed to "get her stuff." (Tr. 37.) Moore also told Patricia that she should leave, and Patricia "looked like she was going to spit in [Moore's] face." (Tr. 38.) Appellant and an individual named Earl were in the kitchen, while Angel, Moore, and Fugate were on the porch.
 {¶ 5} Fugate went to a neighbor's porch to get a cigarette, and he "hollered back across that there was somebody beside the house, and that's when [Fugate] proceeded to tell everybody across the street that it was Buddy[.]" (Tr. 39-40.) Fugate and appellant then went around the side of the house, and they returned about five or ten minutes later. When appellant and Fugate returned, appellant appeared "agitated." (Tr. 40.) The two *Page 3 
men indicated that they had gone into an alley and Fugate had pushed Buddy to the ground, and that, when Buddy got up, appellant and Buddy began punching each other. They additionally indicated to Moore that, when the fight concluded, and Fugate and appellant left, Buddy was lying on the ground. A short time after appellant and Fugate returned to the house, Earl "had stated [that] at 9:00 o'clock he was going to go back to finish it." (Tr. 43.) According to Moore, appellant "was kind of torn. He didn't know whether he wanted to go back or not; and he said, [n]o, I am not going to go; and, yes, I am going to go[.]" (Tr. 44.) Moore, Angel, and two other women then went to a nearby store. On their way to the store, they observed Buddy "sitting on a tree stump just kind of staggering back and forth, like, kind of dazed." (Tr. 47.) They returned to the residence at around 8:15 or 8:30 p.m. Earl again mentioned, "them going back out at nine o'clock." (Tr. 48.) Moore tried to talk appellant out of doing this, and appellant "was torn. He didn't want to go. He wanted to go; he didn't want to go." (Tr. 48.) At approximately 9:00 p.m., appellant and Earl put on their coats and left the residence, saying they were going to the store. Earl and appellant returned approximately 10 to 15 minutes later. Earl told Moore that he and appellant had gone to where Buddy was and Earl beat him with a board he had picked up on the way.
 {¶ 6} Fugate testified that, on the evening of January 10, 2007, he and appellant chased after Buddy near the duplex. According to Fugate, appellant ran between the houses, caught up to Buddy, and started to beat Buddy. Fugate pushed appellant away from Buddy, telling him, "[y]ou got your kids to think about. You do what you have to do. I'm going back home." (Tr. 69-70.) Appellant walked away from the area. Buddy "looked like he was knocked out." (Tr. 70.) Buddy was breathing but appeared to be *Page 4 
unconscious. After returning to the residence, Fugate and appellant let everyone know what they had done to Buddy. Fugate heard Charles Dunkle, also known as "Earl," say "[l]et's go finish him off. Let's go finish him off. I got away with this before[.]" (Tr. 72.) Appellant "leaned his head down like shaking his head like, [n]o, I ain't going to do this. It ain't worth it." (Tr. 73.) Fugate left and decided to check on Buddy because Buddy had been "knocked out" and it was a cold night. (Tr. 73.) He saw Buddy "stumbling around," so he thought Buddy was okay. Id. Sometime later, Fugate again checked on Buddy and again found him to be up and moving around. Fugate returned to his home, watched some television, and went to bed.
 {¶ 7} Michelle McWhorter, appellant's sister and Earl's former girlfriend, testified that she was one of the people at appellant's residence on the night of the homicide. When Michelle's mother, Patricia, returned to the residence to take her things, there was a confrontation between her and Moore. During this confrontation, Fugate crossed the street to get a cigarette from a neighbor. Fugate yelled to appellant from across the street, informing appellant that he could see Buddy. Fugate and appellant ran after Buddy. Fugate and appellant were gone for approximately 20 to 25 minutes. When they returned, appellant stated that he and Fugate had fought Buddy. Michelle, Moore, a woman named Rita, and Angel walked to a store, and on the way back to the house, they decided to make sure Buddy was alive. They saw Buddy sitting "dazed" on a "stump." (Tr. 90.) Upon learning that Buddy was okay, Earl told appellant that they needed "to go finish this." (Tr. 91.) Appellant was not sure what he wanted to do, and Earl stated that they could "get away with it, because I have done it before." Id. Michelle, Heather, and Angel told Earl and appellant not to leave. Earl and appellant left. When Earl and *Page 5 
appellant returned, Earl had blood on his hand and stated that he "couldn't stop hitting Buddy." (Tr. 94.)
 {¶ 8} Angel McWhorter, appellant's wife, testified that, when appellant and Fugate returned, appellant said they had just "beat Buddy up." (Tr. 115.) They stated that the fight ended when appellant kicked Buddy in the head. When Angel and the other women passed Buddy on the way home from the store, Buddy was lying on the ground, snoring. Subsequently, Angel was told that Earl was trying to convince appellant to go back. Angel "told [appellant] that he had just gotten a good job and that he needed to sit there and think about [her] and the kids. * * * [Angel] had told him that Buddy wasn't worth it. He said [Buddy] may not be worth it but [Angel] and [appellant's] babies are." (Tr. 118.) Thereafter, appellant left with Earl. When appellant was in jail, he told Angel to place, in a dumpster, the coats that he and Earl had worn on the night of the homicide.
 {¶ 9} Columbus Police Officer Glen Bray's testimony indicated that, on the night of January 10, 2007, an unidentified man called 911 to report that someone was lying unconscious in an alley behind 490 East Morrill Avenue. Officer Bray and his partner met with the caller and found the unresponsive man, who was later identified as Buddy. Buddy was lying facedown with a hood from a sweatshirt covering the back of his head. Buddy was alive, but when Officer Bray pulled back the hood, he saw that Buddy's head and face were mutilated. Also, he could hear "gurgling," which he believed was caused by blood obstructing Buddy's airway. The officer radioed for medics.
 {¶ 10} The coroner's report indicates that Buddy died the next day at Grant Hospital. The coroner testified that Buddy's cause of death was blunt impacts to the head *Page 6 
with skull and brain injuries. The coroner opined that Buddy's head was likely already down and against something, such as the ground, when he was hit with an object.
 {¶ 11} Columbus Police Detective Jay Fulton testified regarding the investigation of Buddy's death. Among the items that were collected in this investigation was a "four-inch-by-four-inch landscape timber" found in the vicinity of the crime scene. (Tr. 217.) This piece of wood was splattered with Buddy's blood. Detective Fulton interviewed appellant on the night of the homicide at Columbus Police headquarters. Appellant admitted to Detective Fulton that he repeatedly struck Buddy when he and Fugate confronted Buddy. Appellant told the detective that, when he returned to his home, he discussed with others what had happened, and Earl stated that they needed to "go back and finish [it]." (Tr. 236.) Appellant indicated that he and Earl proceeded to where appellant and Fugate had left Buddy. Appellant additionally stated that, while en route to find Buddy, Earl acquired a landscape timber that had been positioned on the ground next to a large trash receptacle. When the detective asked how Earl knew where to find Buddy, appellant essentially responded, "[b]ecause I led him there." (Tr. 240.)
 {¶ 12} At the conclusion of trial, the jury found appellant guilty of aggravated murder. By judgment entry filed March 6, 2008, the trial court sentenced appellant to 20 years to life in prison. This judgment entry erroneously stated that a prison term was not mandatory. The trial court filed a corrected judgment entry March 24, 2008.
 {¶ 13} On appeal, appellant sets forth the following assignment of error for this court's review:
 THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE APPELLANT WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A *Page 7 
CONVICTION AND WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 14} By his single assignment of error, appellant argues that his conviction for aggravated murder was not supported by sufficient evidence and was against the manifest weight of the evidence.
 {¶ 15} In determining the sufficiency of the evidence, an appellate court must "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v.Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. Additionally, "individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts."Bourjaily v. United States (1987), 483 U.S. 171, 179-180,107 S.Ct. 2775. Whether the evidence is legally sufficient to sustain a verdict is a question of law, not fact. State v. Thompkins (1997),78 Ohio St.3d 380, 386.
 {¶ 16} When assessing whether a conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and ultimately determine "`whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Id., at 387, quoting State v.Martin (1983), 20 Ohio App.3d 172, 175. *Page 8 
Determinations of credibility and weight of the testimony remain within the province of the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. Furthermore, "`[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Thompkins, at 387, quoting Martin, at 175.
 {¶ 17} In this case, defendant was convicted of committing aggravated murder, in violation of R.C. 2903.01, which provides in pertinent part that "[n]o person shall purposely, and with prior calculation and design, cause the death of another[.]" R.C. 2903.01(A). There is no dispute that appellant was not the person who bludgeoned Buddy to death. Even though he was not the principal offender, appellant was prosecuted and convicted as if he was the principal offender. Pursuant to R.C. 2923.03(A)(2), "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense[.]" "Whoever violates [R.C. 2923.03] is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender." R.C. 2923.03(F).
 {¶ 18} In order to support a conviction for complicity by aiding and abetting under R.C. 2923.03(A)(2), "the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." State v.Johnson (2001), 93 Ohio St.3d 240, syllabus. "`Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.'" Id., at 245, *Page 9 
quoting State v. Pruett (1971), 28 Ohio App.2d 29, 34. Aiding and abetting may be established by overt acts of assistance such as driving a getaway car or serving as a lookout. State v. Jackson, Franklin App. No. 03AP-273, 2003-Ohio-5946, at ¶ 32, citing State v. Cartellone
(1981), 3 Ohio App.3d 145, 150. See, also, State v. Trocodaro (1973),36 Ohio App.2d 1, 6. However, "the mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor." State v. Widner (1982),69 Ohio St.2d 267, 269. Furthermore, it has been stated that "`[m]ere approval or acquiescence, without expressed concurrence or the doing of something to contribute to an unlawful act, is not an aiding or abetting of the act.'" State v. Sims (1983), 10 Ohio App.3d 56, 59, quoting Smith v.State (1931), 41 Ohio App. 64, 67-68. Thus, in order to constitute aiding and abetting, the accused must have taken some role in causing the offense. Sims, at 59.
 {¶ 19} Because appellant was charged with aggravated murder, the state was required to prove prior calculation and design, which is the mens rea element of proof necessary to find a violation of R.C. 2903.01(A). See State v. Taylor (1997), 78 Ohio St.3d 15, 18. Whether prior calculation and design exists in a particular case is not determined by a bright line test. Id., at 20. "[E]ach case turns on the particular facts and evidence presented at trial." Id. When the evidence presented at trial "`reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified.'" State v.Conway, 108 Ohio St.3d 214, 2006-Ohio-791, *Page 10 
at ¶ 39, quoting State v. Cotton (1978), 56 Ohio St.2d 8, paragraph three of the syllabus.
 {¶ 20} Appellant argues that the evidence was insufficient to demonstrate that he shared the same requisite criminal intent as Earl, or that he aided and abetted Earl in the aggravated murder of Buddy. In connection with this argument, appellant argues that there was a lack of evidence demonstrating any prior calculation and design, the existence of which was necessary in order for the state to prove aggravated murder as opposed to the lesser-included offense of murder. Appellant argues that the evidence did not demonstrate that he was aware that Earl would eventually brutally kill Buddy. We find these arguments to be unpersuasive when the evidence is construed most strongly in favor of the state.
 {¶ 21} The evidence at trial demonstrated that appellant participated with Fugate in the original assault upon Buddy. When the assault was over, Fugate thought that Buddy had been "knocked out." This testimony was consistent with testimony from other witnesses who observed Buddy between the time of the assault by appellant and Fugate and the subsequent homicide. After Fugate and appellant returned to the residence and talked about what had occurred, Earl made statements concerning what should occur next.
 {¶ 22} Although the testimony was not entirely consistent as to precisely what Earl stated, the testimony at trial could be reasonably construed as showing that Earl was encouraging appellant to go with him to "finish [Buddy] off." In addition, testimony indicated that Earl stated that they could "get away with it, because I have done it before." When these statements were made, it was known that Buddy already had been beaten *Page 11 
by appellant and Fugate. Construing this evidence most favorable for the state, we resolve that Earl's statements reasonably demonstrated an intent to terminate Buddy's life. In other words, the evidence reasonably demonstrated that, in deciding to go find Buddy, it was Earl's objective to kill Buddy.
 {¶ 23} The evidence demonstrated that Earl attempted to recruit appellant in his malicious endeavor. In response to Earl's request, appellant apparently wavered in deciding whether to go with Earl to "finish [Buddy] off." The women at the house, including his wife, urged appellant not to go. After deliberation, he decided to join Earl. Because it would be reasonable to find that appellant understood Earl's objective in going to find Buddy, it can be inferred from appellant's agreement to go with Earl that he concurred with the decision to kill Buddy, and that he would support Earl by joining him. Additionally, appellant assisted Earl by leading him to Buddy's likely location, which he knew because of the earlier assault that left Buddy unconscious. On the way to find Buddy, Earl acquired the landscape timber. Upon finding Buddy, Earl repeatedly struck Buddy with the substantial piece of wood, including striking him in the head when Buddy's head was already on the ground.
 {¶ 24} Appellant contends that Earl's decision to acquire the landscape timber on the way to find Buddy constituted an act that was independent of the earlier conversations regarding finding Buddy to "finish him off." We disagree. Earl's acquisition and use of the substantial piece of wood was entirely consistent with his earlier statements that they should "finish [Buddy] off." Even though there was no evidence that appellant knew that Earl would acquire the landscape timber as the precise means to carry out the objective of killing Buddy, the evidence reasonably demonstrated that appellant was aware of Earl's *Page 12 
calculated decision to kill Buddy, and that appellant decided to join Earl in that malicious endeavor.
 {¶ 25} When these facts are viewed in a light most favorable to the state, it would be reasonable to conclude that appellant shared the criminal intent as the principal offender, and that he aided and abetted the principal offender in the aggravated murder of Buddy. Therefore, we resolve that appellant's conviction for aggravated murder was supported by sufficient evidence. Additionally, although appellant's assignment of error raises the issue of whether appellant's conviction was against the manifest weight of the evidence, appellant does not develop any argument to support his assignment of error in this regard. Upon our review of the record, we cannot conclude that appellant's conviction was against the manifest weight of the evidence.
 {¶ 26} Accordingly, appellant's single assignment of error is overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
 PETREE and FRENCH, JJ., concur. *Page 1