DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal comes to us from a judgment issued by the Lucas County Court of Common Pleas, following a jury verdict finding appellant guilty of aggravated murder with a firearm specification. Because we conclude that the jury's verdict was not against the manifest weight of the evidence, we affirm.
 {¶ 2} Appellant, Phonsavan Phutseevong, was indicted by the Lucas County Grand Jury on December 4, 2002, on one count of aggravated murder, a violation of R.C. 2903.01(A), and one count of felonious assault, a violation of R.C. 2903.11. Each count also included an R.C.2941.145 firearm specification. The indictment resulted from appellant's shooting of a guest, Aaron Nolath, at a wedding reception on November 23, 2002. Appellant pled "not guilty" and the court conducted a two day jury trial. Just prior to trial, a nolle prosequi was entered as to the second count which related to injuries to a second person by the same gunshot which killed Nolath.
 {¶ 3} At trial, two Lucas County Sheriff's officers, Detective Cathy Stooksbury and Lieutenant Donald Atkinson, testified that, after his arrest, appellant was Mirandized and consented to talk with police. Stooksbury and Atkinson conducted a 40 minute interview around noon on the day after the shooting. During that interview, appellant admitted that he shot Nolath, and provided the following information about the events surrounding the shooting.
 {¶ 4} Appellant, a native Laotian, arrived at the VFW reception hall between 10:15 and 10:30 p.m. Appellant knew Nolath, also a Laotian, and saw him at the reception. Shortly after arriving, two Laotian men, unknown to appellant, approached and wanted to talk to him in the restroom. Appellant said he believed the men to be Nolath's associates acting at his request.
 {¶ 5} In the restroom, the men confronted appellant about "running his mouth," and threatened that something bad would happen to him later that night. One of the men spit on him and showed him a 9 mm handgun; the men then left the restroom. Appellant went out and spoke to his mother who was sitting at one of the tables. Appellant told the officers that the men again approached appellant, but he refused to return to the restroom to talk, insisting that they stay in the open where others could see them. Appellant said the men again threatened him and he feared they would kill him some time later that night. Appellant told the officers that he then went up and shot Nolath with a .380 semiautomatic pistol that he had brought to the reception. He said he had to kill Nolath to prevent being killed himself by the two men working for Nolath. Appellant stated that he shot Nolath "because I felt that he was going to shoot me, maybe not then, but maybe later, maybe some time." Appellant did not, however, give any indication that Nolath had overtly threatened him or that he was defending himself from any immediate danger or threat by Nolath.
 {¶ 6} After shooting Nolath, appellant told police he left the reception hall, putting the gun in his waistband. He said he began running because he was scared and to avoid being caught by police. While he ran, his new white K-Swiss tennis shoes came off and his feet got very cold and wet from running in the snow on the ground. Appellant also said that he fell two or three times and the gun must have fallen out of his pants.
 {¶ 7} The interviewing officers verified that the white tennis shoes were found on the road near the hall and that, at the time of his arrest, appellant's feet were red and swollen.
 {¶ 8} After the interview, appellant received hospital treatment for frostbite on his feet. Police also found appellant's cell phone but not his gun. Stooksbury and Atkinson acknowledged that the interview was not audio taped, the only method of electronic recording available at their facility. Stooksbury stated that they opted not to bring in a tape recorder because it intimidated some interviewees. Rather, Atkinson conducted the interview while Stooksbury primarily took notes and later wrote the report. The officers said that appellant was cooperative, talked freely, and appeared calm and "very cool."
 {¶ 9} A third officer, Sergeant Timothy Pilat, testified that he had taken the photos of the murder scene and evidence, exhibits admitted at trial. He noted that after the shooting, many of the 500 wedding guests had fled the reception, which may have disturbed the evidence near the victim. He stated that although a bullet casing was found at the edge of the carpet area and a spent round was also found near the victim, there was no way to determine where each had originally fallen or landed after the shooting. The coroner's report as to Nolath's cause of death was admitted by stipulation. The report stated that the bullet entered Nolath's head on the top of the right side and exited through the left ear.
 {¶ 10} Two other witnesses, Brian Odom, the groom's uncle, and Joshua Burrell, a male friend of the groom, also testified that they saw the argument and commotion which occurred shortly before the shooting. Both then heard a popping or gunshot sound and identified appellant as the man that they then saw put a black handgun into his belt and walk out of the reception hall.
 {¶ 11} Another witness, Linda Ruiz, Nolath's fiancée, was sitting next to Nolath at the reception. She said that both Nolath and appellant were Laotian and knew each other, but were not related. She noticed that appellant, known to her as "L.A.," arrived after she had been at the reception for some time. Ruiz said that, prior to the shooting, she had seen appellant standing by the bar, approximately 20 feet away from where she and Nolath sat at a table. Appellant was facing them and kept staring mainly at Nolath with a "dead blank" look on his face. Ruiz looked back at appellant three or four times, and appellant continued staring at them. Just before Nolath was shot, Ruiz's attention was drawn to an argument and commotion among some of the wedding guests some distance away from the bar and restroom areas. Neither Nolath nor appellant were near or involved in the argument. Ruiz then heard a noise that sounded like a balloon breaking, looked around, but did not see the actual shooting. Realizing that it was a gunshot, she checked on her daughter's safety, pulled her down under the table, and then noticed that Nolath had been shot. Ruiz said that shortly before Nolath was shot, he had gone into the restroom.
 {¶ 12} The next witness, Erica Slavin, the groom's 18-year-old sister, testified that she also noticed an argument and yelling between some of the guests around 10:00 p.m. Slavin said that a short time earlier, she saw appellant standing near the bar with a group of men who tried to get her to "do a shot." She did not know any of the men, but had noticed appellant "just looking around, like, just acting funny. He was just looking around everywhere." Just before the shooting, Slavin was standing and talking with her mother when she looked up and saw appellant walking near her. He appeared nervous or scared and was looking around as if to see if anyone was watching him. Slavin said appellant approached the right side of Nolath who was seated at a table. Appellant pulled out a gun, shot the man, and then put the gun back into his pocket. Slavin testified that appellant shot Nolath from one to two feet away and then walked by her and out the door of the hall. She saw Nolath fall off his chair onto the floor. Slavin did not previously know appellant or Nolath, but identified appellant from a photo lineup the next day and also pointed him out at trial.
 {¶ 13} The state then rested its case. Appellant moved for a Crim.R. 29 acquittal based upon insufficient evidence of prior calculation and design, which was denied.
 {¶ 14} Appellant then testified on defense about the events surrounding the shooting. He stated that he had previously lived in California and had been a member of a gang. He also acknowledged that he had two prior state convictions relating to the possession of firearms and a federal conviction for lying about those convictions on an application to buy a firearm.
 {¶ 15} On the night of the reception, appellant testified that, after he arrived, two Laotian men forced him into the restroom. While there, the two men shoved him to the back of the restroom, grabbed his arms, and forced him to face them. According to appellant, the men told him that they were members of a gang called "Laos Boy Crip" and that Nolath had told them he had been "running his mouth." Appellant said that Nolath also then came into the restroom, spit in his face, and threatened him. One of the men showed appellant a gun under his jersey. Appellant said Nolath left the restroom and went back to his table. Appellant also left the restroom, but the two men followed him as he walked back to the reception, threatening to shoot him in front of his family if he did not talk to them. He said they pulled him into the kitchen area before he reached his mother's table and said to "watch your back, we're going to kill you tonight."
 {¶ 16} Appellant said that they all left the kitchen and the men went over and talked to Nolath at his table. Appellant said one man then left through the front door of the hall and the second walked to the corner near the bathroom. Appellant said he panicked and tried to leave without anyone seeing him. As he was walking out, he said he saw Nolath was looking at him and then saw Nolath "twist" his body. Appellant said he thought Nolath might be "going for a gun" so he pulled out his own gun and shot Nolath from about 15 feet away. He said he did not intend to shoot Nolath when he came to the reception and did not know if Nolath actually had a gun. Appellant claimed that by shooting Nolath, he was protecting himself because he thought Nolath was going to kill him at that moment. Appellant insisted that he had told police the same details, even though police reports and testimony made no references to Nolath coming into the restroom, the conversation in the kitchen, the men talking to Nolath at his table, or Nolath twisting his body just before the shooting.
 {¶ 17} Appellant also testified that, as he walked outside, he heard someone say "Get him-chase him." He also said he heard three or four gunshots behind him and someone began chasing him with a car. Appellant said he ran into a woods near the reception hall and hid in a bush until cars pulled out. He said his new tennis shoes fell off in the parking lot as he was running. Appellant walked about five miles to his mother's boyfriend's home, where he took a shower and was arrested a short time later by police.
 {¶ 18} The jury found appellant guilty of aggravated murder and the attached gun specification. Appellant was sentenced to life with parole eligibility after 20 years for the aggravated murder and three years for the firearm specification, to be served prior and consecutive to the life sentence.
 {¶ 19} Appellant now appeals from that judgment arguing the following sole assignment of error:
 {¶ 20} "The verdict was against the manifest weight of the evidence because the appellant did not act with prior calculation and design."
 {¶ 21} Appellant essentially argues that the verdict was against the manifest weight of the evidence because it either failed to establish the requisite criminal intent for aggravated murder or that he acted in self-defense. Appellant never disputed that he fired the shot that killed Nolath. Rather he argues that the greater weight of the evidence did not establish prior calculation and design because he acted "without thinking" and he feared for his life.
 {¶ 22} Under a manifest weight standard, the appellate court, after "`reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" State v. Thompkins
(1997), 78 Ohio St.3d 380, 387, quoting State v. Martin (1983),20 Ohio App.3d 172, 175. Weight of the evidence indicates that the greater amount of credible evidence supports one side of an issue more than the other. Thompkins, supra, citing Black's Law Dictionary (6 Ed. 1990) 1594. "Weight is not a question of mathematics, but depends on its effect in inducing belief." Id.
 {¶ 23} When applying the manifest weight standard, an appellate court sits as a "thirteenth juror" and may disagree with the factfinder's resolution of the conflicting testimony. Thompkins, supra, at 387. Reversal, however, must be by a concurrence of all three judges and the defendant is then granted a new trial. Id. at 389.
 {¶ 24} R.C. 2903.01 provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * *." "Prior calculation and design" is not defined in the Ohio Revised Code, but "it is generally understood to encompass the calculated decision to kill." State v. Jackson (Jan. 20, 2000), 8th Dist. No. 75354, citingState v. Robbins (1979), 58 Ohio St.2d 74, paragraph one of the syllabus. The amount of care or the length of time the offender takes to consider the act are not necessarily critical factors in themselves in determining prior calculation and design. Jackson, supra, citing Statev. D'Ambrosio (1993), 67 Ohio St.3d 185, 196. Where the "evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified." State v. Cotton (1978),56 Ohio St.2d 8, paragraph three of the syllabus. Thus, no bright-line test exists to specifically establish the presence of "prior calculation and design," and each case turns on the particular facts and evidence presented at trial. State v. Taylor (1997), 78 Ohio St.3d 15, 20 (prior calculation and design present even though shooting occurred after a two to three minute argument).
 {¶ 25} In addition, self-defense is an affirmative defense that the accused must prove by a preponderance of the evidence. R.C. 2901.05;State v. Smith, 10th Dist. No. 04AP-189, 2004-Ohio 6608, at ¶ 16. In order to establish self-defense, the following elements must be established: (1) the defendant was not at fault in creating the situation giving rise to the dispute; (2) the defendant had an honest belief that he was in imminent danger of death or great bodily harm and that the only means of escape from such danger was the use of force; and (3) the defendant did not violate any duty to retreat or avoid the danger. Id.
 {¶ 26} In this case, there was conflicting evidence regarding the events leading up to the shooting. Much of the determination of whether appellant had the requisite intent depended upon the credibility of the witnesses, including appellant. At trial, appellant added significant details which, according to police testimony and reports, were not included in his original statements made just hours after the shooting: that Nolath was a third participant in the restroom confrontation, that appellant was confronted a second time in the kitchen, and that Nolath twisted in his chair just before appellant shot him. Since they relate directly to the element of precalculation and self-defense, the omission of these details in the original statement seems unlikely, and thus, they were less credible when presented at trial to bolster his own testimony and provide justification for the shooting.
 {¶ 27} In addition, appellant claimed that he was 15 feet away from Nolath when he shot him. Credible eyewitness testimony indicates, however, that appellant shot Nolath on the side of the head from approximately one to two feet away.[1] In our view, however, either position could provide evidence of precalculation and design. If appellant was farther away, he had time to deliberate and make a calculated decision to shoot Nolath or could have retreated and avoided the shooting all together. If he shot Nolath at close range, this action indicates the choice to come nearer to the danger rather than retreat and again demonstrates an intentional decision and plan to kill Nolath. Thus, either scenario supports the jury's verdict.
 {¶ 28} As for appellant's assertion of self-defense, evidence was presented that appellant was confronted and threatened by two men almost from the first moment he arrived at the reception. Vague references were made that appellant's own prior actions or statements, at least in part, may have been a factor in causing the initial confrontations. The evidence presented shows that Nolath may have, in fact, threatened appellant in the restroom, that appellant may have been very fearful for his safety, and that he took the men's threats seriously.
 {¶ 29} What the evidence does not show is that, at the time of the shooting, appellant was in imminent danger from Nolath or anyone else and that his only escape was to use force. Although the threats allegedly came primarily from two other men, appellant chose to shoot Nolath, even though he was unsure if Nolath even had a gun. No evidence was presented that appellant attempted to summon help or to inform anyone else of the threats. No evidence corroborated appellant's determination that Nolath sent the two men to kill him. The alleged prior verbal threats and the vague reference to "twisting" by Nolath may explain appellant's fear and actions, but the evidence simply does not show that, at the time of the shooting, appellant was under an imminent threat of danger which would justify the use of deadly force in self-defense.
 {¶ 30} What the evidence does show is that appellant shot Nolath from the side while he was seated at a wedding reception table near his fiancée, her child, and other people. His decision to shoot Nolath, although quickly conceived, was sufficiently removed in time from the threats and confrontations in the restroom or kitchen to permit prior calculation and design. In addition, the evidence does not establish that this was the only escape method possible. The weight of the evidence presented supports the conclusion that, afraid that he might be harmed some time later that night, appellant simply decided to execute a "preemptive strike," calculated to permanently remove what he perceived as a threat by Nolath. Although appellant may have been extremely fearful after the confrontations and threats, the facts presented do not constitute the type of spontaneous, no-thought action which would support a finding of no precalculation and design or justifiable self-defense.
 {¶ 31} Based upon a complete review of the record, we cannot say that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Therefore, we conclude that the jury's guilty verdict as to aggravated murder and the additional firearm specification, were not against the manifest weight of the evidence. Accordingly, appellant's sole assignment of error is not well-taken.
 {¶ 32} The judgment of the Lucas County Court of Common Pleas is affirmed. Court costs of this appeal are assessed to appellant, pursuant to App.R. 24.
Judgment affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Pietrykowski, J., Skow, J., Glasser, J., concur.
Judge George M. Glasser, retired, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.
[1] The coroner's report also noted that there was stippling around the gunshot wound and, at trial, one officer merely observed the "massive stippling" while identifying the autopsy photos. Notwithstanding the representations in the state's brief that this evidence established a close range firing, no evidence or testimony was ever presented to correlate the amount of stippling with the distance of the victim's head from the gun when it was fired.