[Cite as *State v. Baldrick*, 2023-Ohio-4191.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellee | Hon. John W. Wise, J.<br>Hon. Patricia A. Delaney, J. |
| -vs- | |
| | Case No. 23 CAA 05 0029 |
| TIMOTHY P. BALDRICK | |
| Defendant-Appellant | O P I N I O N |


CHARACTER OF PROCEEDINGS:  Appeal from the Delaware County Court of Common Pleas, Case No. 21 CRI 070377


JUDGMENT:  Affirmed

DATE OF JUDGMENT ENTRY:  November 20, 2023


APPEARANCES:


For Plaintiff-Appellee

MELISSA A. SCHIFFEL
Delaware County Prosecutor

KATHERYN L. MUNGER
Assistant Prosecuting Attorney
Delaware County Prosecutor's Office
145 North Union Street, 3rd Floor
Delaware, Ohio 43015

For Defendant-Appellant

WILLIAM T. CRAMER
470 Olde Worthington Road, Suite #200
Westerville, Ohio 43082

*Hoffman, P.J.*

**{¶1}**   Defendant-appellant Timothy P. Baldrick appeals his convictions and sentence entered by the Delaware County Court of Common Pleas, on one count of aggravated murder, one count of murder, two counts of tampering with evidence, and one count of abuse of a corpse, following a jury trial.  Plaintiff-appellee is the state of Ohio.

STATEMENT OF THE CASE AND FACTS

**{¶2}**   On July 15, 2021, the Delaware County Grand Jury indicted Appellant on one count of aggravated murder, in violation of R.C. 2903.01(A), an unclassified felony, with an attendant firearm specification; one count of murder, in violation of R.C. 2903.02(A), an unclassified felony, with an attendant firearm specification; two counts of tampering with evidence, in violation of R.C. 2921.12(A)(1), felonies of the third degree; and one count of abuse of a corpse, in violation of R.C. 2927.01(B), a felony of the fifth degree.  Appellant appeared for arraignment on July 22, 2021, and entered a plea of not guilty to the charges.

**{¶3}**   On September 24, 2021, Appellant filed a written plea of not guilty by reason of insanity and a request for a competency evaluation.  The trial court granted Appellant's motion for a competency evaluation and ordered a psychological evaluation of Appellant.  Following a competency hearing conducted on July 29, 2022, the trial court found Appellant competent to stand trial.

**{¶4}**   The matter proceeded to jury trial on April 14, 2023.  The following evidence was adduced at trial:

**{¶5}**   Virgil Love and his son, Dillon, were fishing on Alum Creek one evening in June, 2021.  Sometime between 11:30 p.m. and midnight, they heard "all this noise" coming from the parking area.  *Id.* at p. 334.  Love decided to walk up to the area and

investigate. While he was ascending the hill, he noticed a white man of average build dragging a kayak. Inside the kayak was a large item covered up. The kayak appeared heavy and Love asked the man if he wanted assistance, but the man declined. Love returned to where he and Dillon were fishing. The two commented on the noise caused by dragging the kayak. Dillon jokingly remarked, "It sounded like he was dragging a body or something." *Id.* at p. 335.

{¶6} Love and Dillon continued to fish for another half hour or forty-five minutes, but decided to go home as the fish were not biting. Dillon gathered up some of the gear and headed toward the car. Dillon returned to the fishing area and told Love, "That guy's up there. * * * He's already loading and leaving." *Id.* at p. 337. Love recalled he and Dillon did not hear any noise when the man was taking his kayak back to his vehicle. A few days later, Love heard news reports about a body in a container found in the area he and Dillon had been fishing. Love subsequently contacted police.

{¶7} Peter Ruopp was kayaking on Alum Creek on the morning of June 28, 2021, when he noticed a plastic tote bin floating near the shoreline. He paddled to the tote assuming it would be filled with bottles and cans as often was the case when he found boxes and bins in the water. As Ruopp attempted to turn the tote with his paddle, he observed "something white [come] out the bottom." Transcript of Proceedings, Vol. II at p. 264. Ruopp thought it was a dead fish, but as "it kept coming out, it was obviously a human leg." *Id.* Ruopp backed away and called 9-1-1. When law enforcement arrived, Ruopp guided officers to the area where he found the tote.

{¶8} Officers were unable to remove the tote from the water up the hillside because the terrain was too rough. Officers navigated the tote around a culvert to a boat

ramp and removed it from the water. The lid was missing the latches and was secured to the tote with duct tape. There were at least ten puncture lacerations in the sides of the tote, which appeared to have been made to allow water to fill the tote so it would sink. When the tote was opened, the body of an unidentified male fell out. Agents from the Ohio Bureau of Investigation, who later processed the evidence, found a piece of a yellow rubber glove under the duct tape surrounding the tote.

{¶9} A tattoo was observed on the victim's forearm. A tattoo consistent with the victim's tattoo was found using a database of booking information and the victim was ultimately identified as Timothy Robert Scott Marcum. The Automated Fingerprint Identification System ("AFIS") returned the same information.

{¶10} A legible UPC code was found on the tote. The particular UPC code corresponded to 45-gallon Sterilite brand totes sold at area big-box stores. Detectives proceeded to various big-box stores in the area and determined three stores sold the particular totes and had the totes in stock. Detectives obtained several hundred pages of receipt records and began to compile the information.

{¶11} Once the identity of the victim was known, law enforcement canvassed the area around Marcum's home and learned he was last seen on June 22, 2021. As a result, law enforcement was able to narrow the transaction date of the purchase of the tote to after that day. They focused on stores closest to the area. A detective noticed a suspicious cash transaction at a nearby Menard's for the purchase of a plastic tote, yellow rubber gloves, duct tape, and 39-gallon trash bags. Law enforcement obtained Menard's store security video from June 24, 2021, at approximately 6:00 p.m. The footage showed an individual purchasing a plastic tote, yellow rubber gloves, duct tape, and large trash

bags.  The individual was wearing a mask and a hat, had a visible tattoo on his arm, and paid cash for the items.  Law enforcement returned to Marcum's neighborhood, showing area residents still images from the store security video of a person of interest.  Someone identified the individual as "Amber's man," Appellant, and provided the location and a description of their home.

{¶12} Law enforcement set up surveillance on Appellant's home and began searching for information about Appellant.  Photographs obtained from social media appeared to match the store security images.  On July 2, 2021, law enforcement obtained and executed a search warrant on Appellant's home.  While searching the home, law enforcement discovered a yellow latex glove with a missing fingertip, a green latch which matched the tote, 39-gallon trash bags, and a pair of shoes which matched the shoes the individual in the store security video was wearing.  Law enforcement also found kayaks at Appellant's home.  They noticed drops of blood on one of the kayaks.

{¶13} Using cellular tracking, law enforcement located Appellant at a hotel in Dublin, Ohio, where they arrested him.  Law enforcement searched the hotel room and located home security cameras in a backpack.  Delaware County Sheriff's Detective Kevin Ullom researched the camera model and found the system communicates to a base station and records to the cloud as well as an SD card located in the base.  Detective Ullom shared the information with other detectives in the sheriff's office.  Detective Philip Flahive recognized a photograph of the base station and recalled seeing one in Appellant's home.  Law enforcement executed a second search warrant and found the base station with a memory card as well as a security camera mounted outside in the area of the back porch.  The security camera contained a memory card.

{¶14} Video footage from the home security cameras, which is date stamped June 22, 2021, depicts Appellant and his wife gardening in their backyard. Marcum comes into view. He is holding a large can of beer. Marcum spends time talking with Appellant and his wife as he walks around the backyard. Appellant's wife leaves around 9:30 p.m., and is not seen on subsequent footage from that evening. After Appellant's wife leaves, Appellant and Marcum are seated around a firepit, clinking glasses, and drinking shots. At approximately 9:59 p.m., Appellant walks toward Marcum, who is still seated by the firepit. Appellant gestures toward Marcum. There are several gunshots and Marcum falls off of his chair onto the ground. Appellant fires a third shot downward as he stands over Marcum. Within 30-40 seconds of the shooting, Appellant retrieves a tarp and places it on the ground near the victim. Appellant places Marcum's body on the tarp and drags his body across the yard. Video footage timestamped 10:11 p.m. shows Appellant hosing off blood and then proceeds to water plants. Marcum had been at Appellant's residence for over an hour. During this time, there is no physical altercation or any suggestion of a conflict between Appellant and Marcum.

{¶15} Based upon the video footage, law enforcement obtained a third search warrant on Appellant's residence. They executed the search warrant on July 6, 2021. Searching the area where the shooting occurred, law enforcement retrieved three 9-millimeter bullet casings, one bullet, and some bullet fragments. A 9-millimeter firearm was never located. Different caliber ammunition was found in the residence.

{¶16} Dr. Bryan Casto, a forensic pathologist and deputy coroner with the Montgomery County Coroner Office, conducted the autopsy of Marcum, who was a John Doe at the time. In addition to the decomposition of the body, Dr. Casto noted Marcum

had two gunshot wounds. One gunshot wound entered Marcum's upper back trapezius muscle area, traveled through the back of his throat and tongue, and exited the left side of his face adjacent to his nose. The other gunshot wound entered the palm of Marcum's left-hand near the thumb and exited through the back of his wrist. Because of the decomposition of Marcum's body, Dr. Casto was unable to determine the proximity of the gun muzzle to Marcum's body when the gun was discharged. Dr. Casto did not find any soot, gunpowder injuries, or any muzzle abrasion. Dr. Casto recovered three bullet fragments from the gunshot wounds. Dr. Casto opined Marcum's death was caused by multiple gunshot wounds.

{¶17} After the state rested, Appellant moved for acquittal pursuant to Crim. R. 29 with respect to the aggravated murder charge. Appellant argued there was no evidence of prior calculation and design. The trial court gave the parties an opportunity to argue their respective positions. After taking the matter under advisement, the trial court denied the motion. Thereafter, the defense rested.

{¶18} The trial court instructed the jury on the applicable law. After deliberating, the jury found Appellant guilty of aggravated murder with an attendant firearm specification, murder with an attendant firearm specification, two counts of tampering with evidence, and abuse of a corpse.

{¶19} Appellant appeared before the trial court for sentencing on April 17, 2023. The trial court merged Count One, aggravated murder, with Count Two, murder, and Count Four, tampering with evidence, with Count Five, abuse of a corpse. The state elected to proceed to sentencing on Count One and Count Four. Thereafter, the trial court sentenced Appellant to a mandatory prison term of life with parole eligibility after 30

years on Count One, a mandatory prison term of three (3) years on the attendant firearm specification to Count One, a mandatory prison term of three (3) years on the attendant firearm specification to Count Two, a term of thirty-six (36) months on Count Three (tampering with evidence), and a term of thirty-six (36) months on Count Four (tampering with evidence).  The trial court ordered the prison terms imposed for each of the firearm specifications be served consecutively to one another, and prior to and consecutively to the prison term imposed on Count One.  The trial court further ordered the prison terms imposed on Counts Three and Four be served concurrently with each other, and concurrently with the other prison terms imposed, for an aggregate prison term of thirty-six (36) years to life.

{¶20} It is from these convictions and sentence Appellant appeals, raising the following as error:

THE WEIGHT OF THE EVIDENCE DOES NOT SUPPORT THE CONVICTION FOR AGGRAVATED MURDER ON THE FACTUAL ISSUE OF PRIOR CALCULATION AND DESIGN.

I

{¶21} In his sole assignment of error, Appellant challenges his conviction for aggravated murder as against the weight of the evidence.

{¶22} In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a thirteenth juror and "in reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses,

and determines whether in resolving conflicts in evidence the jury 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, supra at 387, quoting *State v. Martin*, 20 Ohio App. 3d 172, 175, 485 N.E.2d 717 (1983).

**{¶23}** "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks,* 61 Ohio St. 3d 259, 574 N.E.2d 492, paragraph two of the syllabus (1991).

**{¶24}** Appellant was convicted of aggravated murder, in violation of R.C. 2903.01(A), which provides: "[n]o person shall purposely, and with prior calculation and design, cause the death of another." Appellant contends the evidence did not support a finding of prior calculation and design.

**{¶25}** " '[P]rior calculation' and design * * * indicate[s] studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim." *State v. Taylor,* 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997), quoting 1973 Legislative Service Commission Comment to R.C. 2903.01. The phrase is not defined in the Ohio Revised Code, however, the Ohio Supreme Court has interpreted it "to require evidence of 'more than [a] few moments of deliberation' " and " 'a scheme designed to implement the calculated decision to kill.' " *State v. Conway,* 108 Ohio St.3d 214, 2006–Ohio–791, 842 N.E.2d 996, ¶ 38, quoting *State v. Cotton,* 56 Ohio St.2d 8, 381 N.E.2d

190 (1978), paragraph one of the syllabus. "Instantaneous deliberation is not sufficient to constitute 'prior calculation and design.' " *Cotton*, supra at paragraph two of the syllabus. "In addition, '[n]either the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves,' but 'momentary deliberation' is insufficient." *State v. D'Ambrosio,* 67 Ohio St.3d 185, 196, 616 N.E.2d 909 (1993), quoting the 1973 Legislative Service Commission Comment to R.C. 2903.01. Although 'momentary deliberation' is insufficient, "prior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes." *State v. Coley,* 93 Ohio St.3d 253, 264, 754 N.E.2d 1129 (2001) (Citations omitted).

{¶26} The state can prove "prior calculation and design" from the circumstances surrounding a murder in several ways, including (1) "evidence of a preconceived plan leading up to the murder," (2) "evidence of the [defendant's] encounter with the victim, including evidence necessary to infer that the defendant had a preconceived notion to kill regardless of how the [events] unfolded," or (3) "evidence that the murder was executed in such a manner that circumstantially proved the defendant had a preconceived plan to kill," such as where the victim is killed in a cold-blooded, execution-style manner. *State v. Orr,* 8th Dist. Cuyahoga No. 100841, 2014–Ohio–4680, ¶ 75 (Citation omitted).

{¶27} Whether a defendant acted with prior calculation and design is determined on a case-by-case basis, following an analysis of the specific facts and evidence presented at trial. *Orr* at ¶ 77; *State v. Jones,* 91 Ohio St.3d 335, 345, 744 N.E.2d 1163 (2001). Although there is no bright-line test for determining "prior calculation and design," the Ohio Supreme Court has identified several factors to be weighed along with the totality

of the circumstances surrounding the murder in determining the existence of prior calculation and design, including: (1) whether the defendant and the victim knew each other, and, if so, was the relationship strained; (2) whether there was thought or preparation in choosing the murder weapon or murder site; and (3) whether the act was "drawn out" or "an almost instantaneous eruption of events." *Taylor*, supra at 19, quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102, 355 N.E.2d 825 (8th Dist. 1976).

**{¶28}** Applying the foregoing, we find a rational trier of fact could have concluded beyond a reasonable doubt Appellant acted with prior calculation and design in murdering Marcum.

**{¶29}** It is undisputed Appellant and Marcum knew each other. There was no evidence to suggest Appellant and Marcum had a strained relationship. The home security video records Marcum walking into Appellant's backyard as Appellant and his wife are doing yardwork. Marcum is holding a tall can of beer, which he sips from throughout his time at Appellant's residence. The three walk around the yard, chatting. At some point in the evening, Appellant's wife leaves the residence. Appellant and Marcum sit by the firepit, talking. Appellant gets up several times and enters the house, returning with a couple of shot glasses each time. Appellant and Marcum clink their glasses and swallow their shots. Marcum had been in Appellant's backyard for approximately one hour when Appellant goes inside the house one final time. Appellant returns with a firearm, walks over to the fire pit where Marcum is still seated, and shoots Marcum three times at close range. Appellant made a conscious decision to get his firearm while he was inside. Appellant wears gardening gloves the entire time Marcum is in the backyard,

occasionally removing one of the gloves then putting it back on.  Appellant waited until his wife was away from the residence.  There were no neighbors around.

{¶30}  Evidence of a preconceived plan is not the only way to prove the element of prior calculation and design. As stated, supra, the state can also offer evidence the murder was executed in such a manner that circumstantially proved the defendant had a preconceived plan to kill. See,  *State v. Trewartha,* 165 Ohio App.3d 91, 2005–Ohio–5697, 844 N.E.2d 1218, ¶ 19. Thus, the state is able to satisfy its burden by showing the murder was executed in such a manner which circumstantially proves a preconceived notion the victim would be killed regardless of the situation. See, *Id.* at ¶ 33. Here, Appellant killed Marcum in a cold-blooded, execution-style manner.  When a victim is killed in a cold-blooded, execution-style manner, the killing bespeaks aforethought, and a jury may infer prior calculation and design. *Id.*

{¶31}  Considering the totality of the circumstances, we find this cold-blooded killing bespeaks aforethought, not a sudden eruption of events, and provided circumstantial evidence of Appellant's prior calculation and design.

{¶32}  Based upon the foregoing, we cannot find the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."

**{¶33}**  Appellant's sole assignment of error is overruled.

**{¶34}**  The judgment of the Delaware County Court of Common Pleas is affirmed.


By: Hoffman, P.J.

Wise, J.  and

Delaney, J. concur